Raymond Wayne HILL,
Plaintiff-Appellant,

v.

The CITY OF HOUSTON, TEXAS,
Defendant-Appellee.

No. 84–2181.

United States Court of Appeals,
Fifth Circuit.

July 11, 1985.

Opinion on Granting of Rehearing En Banc Sept. 4, 1985.

Patrick E. Higginbotham, Circuit Judge, dissented and filed opinion.

Michael A. Maness, Houston, Tex., for plaintiff-appellant.

Roy F. Martin, III, Senior Asst. City Atty., City of Houston Legal Dept., Mark Elvig, Asst. City Atty., Houston, Tex., for defendant-appellee.

Before THORNBERRY, RUBIN and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

This appeal involves the constitutionality under the First and Fourteenth Amendments to the Constitution of a city ordinance that prohibits an individual from in any manner opposing, molesting, abusing, or interrupting a policeman in the execution of his duty. An individual who has been arrested several times for violating the ordinance, and who has never been found guilty, challenges its constitutionality as violating his right to freedom of speech. We hold that the plaintiff has standing to challenge the constitutionality of the ordinance, and that the section in its present form is facially overbroad and unconstitutional. We therefore reverse the judgment of the district court and remand for a determination of the appropriate relief to be awarded to the plaintiff.

## I.

Section 34–11(a) of the Code of Ordinances of the City of Houston, Texas, provides:

> Sec. 34–11. *Assaulting or interfering with policemen.*
>
> (a) It shall be unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest.

Violation of the Ordinance is a Class C misdemeanor, punishable upon conviction in the Municipal Court of the City of Houston by a fine not to exceed $200.00.

While Houston Police Department officers J.L. Kelley and R.D. Holtsclaw were making a traffic arrest at the intersection of Westheimer and Whitney streets in Houston, they noticed Charles Hill, who is unrelated to the plaintiff, directing traffic and stopping vehicles, including a city bus, in a heavily travelled lane of traffic on Westheimer. Officer Kelley approached Charles Hill and began speaking with him about his behavior. The testimony about what happened next is conflicting. Raymond Hill testified that, after a short conversation between Officer Kelley and Charles Hill, Charles attempted to leave, but Officer Kelley grabbed him by the shoulder and began yelling at him. Raymond Hill further testified that, after Officer Kelley permitted Charles to leave, Kelley chased him, and, upon catching him and being joined by his partner, challenged Charles to fight. The district court, however, disregarded this testimony, and found that "Officer Kelley approached Charles Hill and began speaking with him." Such a finding is supported by the record and is not clearly erroneous.[1]

At this point, Raymond Hill yelled to the policemen, in an admitted attempt to divert their attention from Charles Hill, "Leave him alone. Why don't you pick on somebody your own size?" or words to that effect. Raymond Hill was standing approximately twenty-five feet from the officers. His statements were unaccompanied by any menacing or threatening gesture, although Officer Kelley characterized the tone of Hill's speech as "loud" and "boisterous." There is no evidence to support the district court's finding that Raymond Hill "shout[ed] abuses" at Officer Kelley.

According to Officer Kelley's testimony, after Raymond Hill yelled to him, Kelley turned towards Hill and asked, "Are you interrupting me in my official capacity as a Houston police officer?" He testified that Hill, who was standing with a crowd of people behind him, put his hands on his hips and replied, "Yes. Why don't you pick

---

1. *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487, 489 (5th Cir.1985).

on somebody my size?" Officer Kelley then arrested Raymond Hill and charged him with violating the ordinance. There is nothing in the record to show that Officer Kelley had warned Hill that, if he was interfering with an officer, he would be arrested. After a trial in municipal court, Hill was found not guilty.

This was not the first time Raymond Hill had been charged with violating the ordinance. In 1975, Hill approached Officers Stoffel and Strodman while they were making a traffic arrest. Hill first wrote down the identification numbers on the officers' vehicle, and then walked to within arm's length of one of the officers on the side nearest the officer's revolver. Officer Stoffel asked Hill to move along. Instead of complying, Hill moved closer to the officers, and was then arrested. He was later tried and found not guilty.

In 1977, Hill was standing near the Asylum Bookstore, an adult arcade in which the police suspected illegal activities were in progress. When Hill observed vice squad cars parked nearby, he entered the bookstore and announced over the public address system that police officers were present and that the patrons should be prepared to produce identification. The patrons fled upon hearing the announcement, and Hill was arrested for interfering with the investigation. The case was subsequently dismissed.

Finally, in October, 1982, eight months after he was arrested for the incident involving Charles Hill, Raymond Hill was arrested for violating the ordinance when he refused to leave the immediate area where two police officers were investigating a car parked with an unknown, unconscious person inside. The charges were later dismissed when the arresting officers failed to appear in Municipal Court.

After hearing testimony from Raymond Hill and Officer Kelley, as well as testimony from other individuals who had been arrested under the ordinance and other Houston police officers who have made arrests under the ordinance, the court entered judgment for the City of Houston. The court first found that Raymond Hill lacked standing to challenge the unconstitutionality of the ordinance. The court went on to hold that, even if Hill did have standing, his claim for relief would still be denied because the ordinance was neither overly broad, void for vagueness, nor applied in an unconstitutional manner as to Hill's arrest in February, 1982.

## II.

We turn first to the issue of standing. Although the district court recognized that the usual rules of standing do not necessarily apply "when First Amendment interests are at stake," the court found "that the Plaintiff has not succeeded in raising any valid First Amendment claims," and, on this basis, denied Hill standing to pursue his claim.

Hill's standing to litigate the constitutionality of the ordinance must not be confused with the apparent merit or lack of merit in his challenge. "Standing" is one element of the "case or controversy" limitation on federal court jurisdiction, and focuses primarily "on the party seeking to get his complaint before a federal court." [2] "The gist of the question of standing" is whether the plaintiff has alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions." [3]

In other words, standing involves whether this plaintiff is a proper party to request an adjudication of the particular issue. This is a separate inquiry from whether the party should prevail. In fact, it is not

**2.** *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).

**3.** *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *KVUE, Inc. v. Austin Broadcasting Corp.*, 709 F.2d 922, 927–28 (5th Cir.1983), *aff'd*, — U.S. —, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984).

proper for the court to consider the likelihood of success on the merits in determining the plaintiff's standing to proceed.[4]

■ Hill did not raise the constitutionality of the city ordinance as a defense to his prosecution under the law. Instead, he brought a separate action, independent of any pending or threatened prosecution, alleging the unconstitutionality of the ordinance and seeking declaratory and injunctive relief. Specifically, Hill alleges that, irrespective of both his own prior conduct and the possibly constitutional application of the ordinance to him on earlier occasions, the law nevertheless is unconstitutional because "the challenged ordinance on its face substantially abridges First Amendment rights."

The usual standing rule in this situation is clear: "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional."[5] When the challenge is based on the First Amendment, however, different considerations apply. As explained by the Supreme Court:

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, where there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. "Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from protected speech or expression."[6]

Protection of free speech is so important that courts have allowed plaintiffs in a myriad of suits for declaratory or injunctive relief to raise First Amendment challenges to statutes because of their alleged overbreadth or vagueness.[7]

■ Even with the heightened sensitivity federal courts use in determining a litigant's standing to challenge a statute on First Amendment grounds, certain threshold requirements must be satisfied before the court may consider such a claim. These requirements are most clearly set forth in *City of Los Angeles v. Lyons.*[8] There, Lyons sought damages arising out

4. *See Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *KVUE, Inc. v. Austin Broadcasting Corp.,* 709 F.2d 922, 927 (5th Cir.1983), *aff'd,* — U.S. —, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984); *O'Hair v. White,* 675 F.2d 680, 685 (5th Cir.1982) (en banc). *See generally* 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3531 (1984).

5. *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960). *See Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973) and cases cited therein.

6. *Secretary of State of Maryland v. Joseph H. Munson Co.,* — U.S. —, —, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984), *quoting Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) (footnote omitted).

7. *See, e.g., Secretary of State of Maryland v. Joseph H. Munson Co.,* — U.S. —, —, 104 S.Ct. 2839, 2847–48, 81 L.Ed.2d 786 (1984); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 633–35, 100 S.Ct. 826, 834–35, 63 L.Ed.2d 73 (1980); *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979); *Broadrick v. Oklahoma,* 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830 (1973); *Dombrowski v. Pfister,* 380 U.S. 479, 486–87, 85 S.Ct. 1116, 1120–21, 14 L.Ed.2d 22 (1965); *KVUE, Inc. v. Austin Broadcasting Corp.,* 709 F.2d 922, 927–31 (5th Cir.1983), *aff'd,* — U.S. —, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984); *Holy Spirit Association for Unification of World Christianity v. Hodge,* 582 F.Supp. 592, 596 (N.D. Tex.1984). *Cf. United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736, (1983); *Erznoznik v. City of Jacksonville,* 442 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

8. 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

of injuries he had received from a choke hold administered by the Los Angeles police. Lyons also sought declaratory relief and an injunction against the city prohibiting choke holds in all but those situations when there is the threat of the immediate use of deadly force against the officer.

The Supreme Court found Lyons lacked standing because the one episode "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." [9]

The Court specifically pointed out that Lyons' "lack of standing" to seek equitable relief rested "on the speculative nature of his claims that he will again experience injury as the result of that practice even if continued." [10] The Court also relied on its earlier decisions in *Golden v. Zwickler* [11] and *Ashcroft v. Mattis,* [12] in which it held that standing to challenge a statute was not established merely by the fact that the plaintiff had on a single previous occasion been harmed by the statute's application, absent a realistic likelihood that the statute would, in the future, be applied to his own detriment. [13]

The record and findings of fact by the district court show that Hill has the requisites to standing defined in *Lyons.* Hill has been arrested for violating the ordinance four times, once less than six months after he filed this suit. In addition, Hill has repeatedly and steadfastly asserted that he intends to continue to act in a manner that will subject him to further arrests under the ordinance. Hill has shown, therefore, that he faces more than a "subjective apprehension" of repeated injury; [14] he faces a "credible threat" of future criminal prosecutions under the ordinance that is more than a mere speculative and remote possibility. [15] Hill, therefore, clearly has standing to challenge the constitutionality of the ordinance on First Amendment grounds.

### III.

■ We now consider Hill's claims that Section 34–11(a) is unconstitutionally vague, overbroad, and was applied in an unconstitutional manner to effectuate his arrest in February, 1982. Because we find the ordinance to be unconstitutionally overbroad, we do not reach Hill's other two arguments.

"An overbroad statute is one that is designed to burden or punish activities which are not constitutionally protected, but [that] includes within its scope activities which are protected by the First Amendment." [16] An overbroad statute is invalid on its face, not merely as applied, and cannot be enforced until it is either redrafted or construed more narrowly by a properly authorized court. [17] This, in effect, removes the speech-limiting "sword of Damocles" from over the heads of those who might wish to engage in expression protected by the First Amendment, but who are deterred in their inclination to speak when they learn that what they seek

---

**9.** *Id.* at 106, 103 S.Ct. at 1667.

**10.** *Id.* at 109, 103 S.Ct. at 1669.

**11.** 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

**12.** 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977).

**13.** *Lyons, supra,* 461 U.S. at 104–106, 103 S.Ct. at 1666–67. *Accord Carter v. Orleans Parish Public Schools,* 725 F.2d 261, 263 (5th Cir.1984).

**14.** *Lyons, supra,* 461 U.S. at 107 n. 8, 103 S.Ct. at 1668 n. 8.

**15.** *Kolender v. Lawson,* 461 U.S. 352, 355 n. 3, 103 S.Ct. 1855, 1857 n. 3, 75 L.Ed.2d 903 (1983); *Wooley v. Maynard,* 430 U.S. 705, 712, 97 S.Ct. 1428, 1434, 51 L.Ed.2d 752 (1977).

**16.** J. Nowak, R. Rotunda & J. Young, Handbook on Constitutional Law 722 (1978).

**17.** G. Gunther, Cases and Materials on Constitutional Law 1186–87 (10th ed. 1980).

to say is rendered unlawful by the overbroad provisions of the statute.[18]

■ The Supreme Court in *Broadrick v. Oklahoma*,[19] warned that the application of the overbreadth doctrine is "strong medicine" and it is to be employed "sparingly and only as a last resort."[20] In order to employ the doctrine to invalidate a statute, therefore, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."[21] This standard applies regardless of whether a law by its terms proscribes conduct or speech: the overbreadth must be substantial before a court may hold the statute to be facially invalid.[22]

Despite the stringent requirements that must be satisfied before a statute will be struck down as facially invalid, the overbreadth doctrine remains a viable challenge to laws that impinge on activities protected by the First Amendment, and it has been applied by the Court several times since *Broadrick*. In *Erznoznik v. City of Jacksonville*,[23] for example, the Supreme Court sustained a challenge to the facial validity of an ordinance prohibiting drive-in movie theaters with screens visible from public streets from showing films containing nudity.[24] The Court reiterated *Broadrick*'s warning that the overbreadth doctrine would be applied with "caution and restraint" to avoid "unnecessary interference with a state regulatory program,"[25] and that, for a statute to be deemed facially invalid, its deterrent effect on legitimate expression must be both real and substantial.[26]

The Court found all of these criteria to be met. It noted that the statute applied to all persons employed by, or connected with, drive-in theatres, and forced theatre owners either to restrict their movie offerings or to provide protective fencing.[27] This type of content-based regulation,[28] although aimed at protecting "captive audiences" and promoting highway safety, was too imprecisely drawn to pass First Amendment scrutiny. "[A] 'pure' movie is apt to be just as distracting to drivers as an 'impure' one, and to be just as intrusive upon the privacy of an unwilling but captive audience."[29] Because the ordinance impermissibly intruded upon an identifiable and substantial class of free speech rights protected by the First Amendment, the Court held the statute to be overbroad and, therefore, invalid.

Similarly, in *Village of Schaumburg v. Citizens for a Better Environment*,[30] the Court found unconstitutional an ordinance prohibiting door-to-door solicitation of contributions by charitable organizations that did not use at least 75 percent of their receipts for "charitable purposes," such purposes being defined to exclude solicitation expenses, salaries, and other administrative expenses.

The Court held that the ordinance was overbroad. It found that the proffered justifications of protecting the public from fraud and insuring residential privacy were

---

**18.** *See Arnett v. Kennedy*, 416 U.S. 134, 231, 94 S.Ct. 1633, 1682, 40 L.Ed.2d 15 (1974) (Marshall, J. dissenting); M. Nimmer, Freedom of Speech § 4.11[A] (1984).

**19.** 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

**20.** *Id.* at 613, 93 S.Ct. at 2916.

**21.** *Id.* at 615, 93 S.Ct. at 2918.

**22.** *See New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). *Accord Ferguson v. Estelle*, 718 F.2d 730, 732–33 (5th Cir. 1983); *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1216–17 (5th Cir.1982). *See generally* M. Nimmer, *supra*, at § 4.11[B].

**23.** 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

**24.** *Id.* at 206–07, 95 S.Ct. at 2271.

**25.** *Id.* at 216, 95 S.Ct. at 2276.

**26.** *Id.*

**27.** *Id.* at 217, 95 S.Ct. at 2277.

**28.** *Id.* at 218, 95 S.Ct. at 2277 (Douglas, J., concurring).

**29.** *Id.*

**30.** 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

inadequate to sustain the ordinance. Although it did not discount the legitimacy of these governmental interests, the Court determined that they could be "sufficiently served by measures less destructive of First Amendment interests." [31]

## IV.

■ These cases and others discussing substantial overbreadth under *Broadrick*'s standards,[32] dictate the approach we must take in analyzing the alleged overbreadth of the ordinance. We must first determine not whether Hill's conduct is protected by the First Amendment but whether the statute might be applied to others not before the court whose activities are constitutionally protected. This, in turn, requires us to consider the potential applications of the law, the adequacy of the City's justifications for having the ordinance in its present form, and the possibility of serving the City's interests with a more narrowly drawn law. Following this line of analysis, we hold that Section 34–11(a) is unconstitutionally overbroad.

■ The ordinance makes it "unlawful for any person to assault, strike, or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty." The first clause protects the policeman from being assaulted or struck in the performance of his duty, and clearly applies only to physical conduct. This clause of the ordinance properly "covers a whole range of easily identifiable and constitutionally proscribable ... conduct," [33] and presents no real and substantial overbreadth problems in its possible applications.

The next clause, however, separated from the first by the conjunction "or," makes it "unlawful for any person ... *in any manner* [to] oppose, molest, abuse or interrupt any policeman in the execution of his duty...." (emphasis supplied). This clause permits many impermissible applications of the statute, applications that significantly compromise traditional First Amendment activities.

The conduct literally proscribed by the ordinance includes much that is completely lawful. The dictionary defines "oppose," for example, to include, "to stand in the way of; hinder or obstruct," "to have an adverse opinion concerning" or "to offer arguments against." [34] "Molest" is defined as, "to bother, interfere with, or annoy." [35] "Interrupt" is defined to include, "to stop [a person] in the midst of saying or doing something esp. by an interjected remark." [36] Applying these definitions [37] to the second clause of the ordinance, it is clear that the statute affects a broad range of protected activities. If a mother pleads with a policeman to "spare my baby" while the policeman arrests her son in front of their home, she has "opposed" the policeman in the execution of his duties. If a tourist sees two policemen on the street questioning a citizen, and stops to ask them directions to a hotel, the tourist has "interrupted" the officers in the execution of their duties. If a person in a crowd at a political function continually begs the policeman to let him past the barricade, that person has "molested" the policeman in the execution of his duties. The district court found that Officer Kelley warned Hill that

**31.** *Id.* at 637, 100 S.Ct. at 836.

**32.** *See Secretary of State of Maryland v. Joseph H. Munson Co.,* —— U.S. ——, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Members of City Council v. Taxpayers for Vincent,* —— U.S. ——, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). *Cf. Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). *See generally* G. Gunther, Cases and Materials on Constitutional Law 1187 (10th ed. 1980).

**33.** *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974), *quoting Unit-*

*ed States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 580–81, 93 S.Ct. 2880, 2898, 37 L.Ed.2d 796 (1973).

**34.** The Random House College Dictionary 933 (revised ed. 1975).

**35.** *Id.* at 860.

**36.** *Id.* at 698.

**37.** *See Kramer v. Price,* 712 F.2d 174, 179 (5th Cir.1983) (Rubin, J., dissenting).

he might be interfering with a policeman in the execution of police duties, but the ordinance requires no such warning and its language would permit a charge to be lodged without any advance warning against anyone who annoyed, hence "molested," a policeman.

In short, the second clause of Section 32–11(a) encompasses mere verbal as well as physical conduct. In such a situation, "where the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack." [38] The areas of protected conduct encompassed by the ordinance are more than mere "marginal applications in which the statute would infringe on First Amendment values." [39] They comprise a substantial range of protected speech and verbal communications that might be deterred by the present wording of the statute.

The rationale for the ordinance put forward by the City of Houston does not justify its broad sweep. The legitimacy of the City's interest in "facilitating police duties" is beyond question. This interest in and of itself, however, is not of such overriding importance that it can serve as the basis for an ordinance that permits policemen to arrest people for merely speaking to them, purely verbal conduct that is fully protected by the First Amendment. "Surely one is not to be punished for nonprovocatively voicing his objection to what he obviously [feels is] ... highly questionable [conduct] by a police officer." [40]

The City's interests can be served adequately by a more narrowly drawn statute tailored more precisely towards the conduct the City wishes to proscribe. For example, federal law prohibits "assaulting, resisting or impeding" certain federal officers.[41] It is similar to the Houston city ordinance, but it qualifies the proscribed conduct with the adverb "forcibly." The statute thus applies only to persons who use physical force to assault, resist, or oppose a person covered by the section.[42] Mere verbal resistance is not proscribed by this section.[43]

While dissenting, our brother Higginbotham concedes that the ordinance is overbroad, and differs with us only as to the substantiality of its admittedly unconstitutional reach. Like Mercutio's wound, the constitutional abridgment is not so deep as a well nor so wide as a church door but it is penetrating enough to be fatal.

■ The ordinance would not be invalid for overbreadth if it were possible to construe it narrowly so as not to impact on protected speech. Federal courts, however, "do not sit as a 'super' state legislature, [and] may not impose [their] own narrowing construction onto the ordinace" if the state courts have not already done so.[44] Here, there is no indication that any

**38.** *Members of the City Council v. Taxpayers for Vincent,* — U.S. —, — n. 19, 104 S.Ct. 2118, 2126 n. 19, 80 L.Ed.2d 772 (1984), *citing Erznoznik v. City of Jacksonville,* 422 U.S. 205, 217, 95 S.Ct. 2268, 2276–77, 45 L.Ed.2d 125 (1975).

**39.** *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974).

**40.** *Norwell v. City of Cincinnati,* 414 U.S. 14, 16, 94 S.Ct. 187, 188, 38 L.Ed. 170 (1973).

**41.** 18 U.S.C. § 111 provides, in pertinent part, as follows:

Whoever forcibly assaults, resists, opposes, impedes, intimidates or interferes with any person designated in section 114 of this title while engaged in or on account of the performance of his official duties, shall be fined

not more than $5,000 or imprisoned not more than three years, or both.

**42.** *See United States v. Mathis,* 579 F.2d 415, 418 (7th Cir.1978); *United States v. Camp,* 541 F.2d 737, 739 (8th Cir.1976) and cases cited therein.

**43.** *See United States v. Cunningham,* 509 F.2d 961, 963 (D.C.Cir.1975); *United States v. Glover,* 321 F.Supp. 591, 594 (D.Ark.1970).

**44.** *Beckerman v. City of Tupelo, Mississippi,* 664 F.2d 502, 509 (5th Cir.1981), *citing Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972). *See also Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216–17, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975). *Accord Gormley v. Director, Connecticut State Department of Probation,* 632 F.2d 938, 942 n. 5 (2d Cir.), *cert. denied,* 449 U.S. 1023, 101 S.Ct. 591,

state court has placed a limiting construction on the ordinance, and, indeed, the City itself has not suggested one that this court might use had it authority to do so. Instead, the City asserts categorically that the ordinance "does not reach more broadly than is reasonably necessary to protect legitimate governmental interests." Our brother in dissent concedes that, as thus read, "the ordinance is undeniably overbroad," [45] but argues that we should sua sponte proffer possible constructions that would limit its overbreadth. It is not within our power to construe municipal ordinances that have not been limited by state courts, and it is certainly beyond our province to volunteer interpretations not urged by the City itself.[46] Overbreadth, therefore, cannot be avoided by a narrowing construction.

For the foregoing reasons, we hold that Section 32–11(a) is unconstitutionally overbroad, and therefore invalid in its entirety. The judgment of the district court is therefore REVERSED, and the case REMANDED for consideration of the appropriate relief to be awarded to the plaintiff.

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

I am persuaded that the application of the Houston ordinance here did not tread on Raymond Hill's right to free speech, an inquiry the majority escapes by use of the overbreadth doctrine, and I am persuaded as well that the regulation is not impermissibly overbroad. My difference with the majority is fueled in the main by a different perception of the context in which Raymond Hill's assertedly protected speech occurred, and by a greater reluctance to trigger the doctrine of overbreadth. Because I find this application of the ordinance to be constitutional and no substantial overbreadth of the ordinance to be shown, I would leave potentially troublesome cases for another day.

## I

Raymond Hill, a homosexual, is a forty-three year old resident of Houston, Texas. After serving five years in the state penitentiary for burglary convictions, Hill returned to Houston in 1975 and formed the Gay Political Caucus. He has since been a vocal advocate of rights for homosexuals, and sits on the Board of Directors for the Caucus. In addition to his employment as a paralegal, he does radio shows for a local community service broadcasting station and, accordingly, carries a press badge.[1]

Before his now challenged arrest of February 14, 1982, Hill had been arrested twice for violating the disputed ordinance, although he was never convicted. He had read the ordinance and had, in fact, filed suit in a Houston federal court challenging its constitutionality. That suit was dismissed without any decision. While it is true, as the majority recites, that at the time of the February 14, 1982 arrest Hill was not told that he would be arrested if he persisted in interfering with the ongoing investigation, he had been told precisely that at the time of an earlier arrest. In short, Hill was as familiar with the ordinance as Officer Kelley, if not more so.

Nor was this confrontation happenstance. Hill testified that he deliberately confronted officers engaged in making arrests. There was also evidence that on one of his prior arrests, Hill had taunted the

66 L.Ed.2d 485 (1980); *Walker v. Dillard,* 523 F.2d 3, 6 (4th Cir.), *cert. denied,* 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975). *See generally* M. Nimmer, *supra* at § 4.11[D].

**45.** 764 F.2d at 1170 (Higginbotham, J., dissenting).

**46.** *See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216 n. 15, 95 S.Ct. 2268, 2276 n. 15, 45 L.Ed.2d 125 (1975).

1. I surface these facts not to suggest that Hill is entitled to any greater or lesser First Amendment protection because of them, but in order to provide a more complete picture of the individual who confronted Officers Kelley and Holtsclaw. These facts were brought out at trial not by the City, but by Hill, in an effort to show that he was a likely target for harassment by local police. It is undisputed, however, that neither Kelley nor Holtsclaw knew Hill or his reputation before they arrested him.

arresting officer that no one would find him guilty of violating the ordinance. Hill was disturbed by what he perceived to be police harassment of homosexuals and explained his response to such police conduct as follows:

> Well, I would rather that I get arrested than those whose careers can be damaged; I would rather that I get arrested than those whose families wouldn't understand; I would rather that I get arrested than those who couldn't spend a long time in jail. I am prepared to respond in any legal, nonagressive or nonviolent way, to any illegal police activity, at any time, under any circumstances.

Thus, it was a sophisticated and confrontation-minded Hill that came to the street scene in the Montrose section of Houston on February 14, 1982. Montrose is heavily populated with members of the gay community and a busy "cruising" area for prostitutes, male and female. Indeed, although it was shortly after midnight, the area still had heavy traffic.

Officer Kelley testified before the federal court below that he confronted a black male who had been attempting to direct traffic on busy Westheimer Boulevard. When Kelley ordered the man to the sidewalk and asked for identification, the man began making gutteral sounds and twitching motions which Kelley later learned were the product of a disability. As Kelley described the black man:

> He was a very strange individual. His actions were extremely erratic and strange. He was twitching all of the time.... His whole body would jerk while he was speaking and I didn't know what to make of that. I didn't know if he was about to have a seizure or if he was being insolent or what. I had no idea what to think of it.

Before Kelley could determine the cause for the black man's behavior, he began walking away. Kelley explained:

> So while I was speaking to him, his mind seemed to wander and he just seemed to turn and walk away. I still had his I.D. in my hand, ... and he was walking away, twitching and making all kinds of strange noises from his throat.

.   .   .   .   .

> I told him to stop. I told him to come back and he kept walking. I walked behind him and kept telling him to stop and he kept walking, so I reached out and turned, took him by the arm and stopped him, turned him around.

To complicate matters, a crowd began forming as Kelley proceeded to further interrogate this unusual detainee. As he described it:

> I felt a crowd forming around me; there was numerous people walking up and down the sidewalks and they were crossing the street and they were slowing down, but they all seemed to be converging and centering in an area right behind me here on the corner.

It was at this point that Raymond Hill entered the picture, standing in front of the crowd, "in control" of it, according to Kelley, and approximately seven or eight yards away from the spot where Kelley and the black man were standing. Kelley "heard Mr. Hill holler to me to leave him alone, he hadn't done anything wrong," but Kelley ignored the challenge and turned back to his investigation. Immediately Hill yelled again, as Kelley described it, "[this] time ... more loud, more boisterous ..., 'I said, leave him alone. Why don't you pick on somebody your own size?'" Kelley interpreted the remark as somewhat threatening because of the tone Hill used: "[It was a] very loud, very strong voice. A commanding voice. In other words, it wasn't—he wasn't requesting me to leave him alone; he was demanding that I leave him alone." Hill's rapport with the crowd contributed to the threat Kelley perceived because, in Kelley's view, the situation was likely to escalate if Hill was permitted to continue his challenge.

Accordingly, Kelley asked Hill whether he was interrupting Kelley in his official duties as a policeman. Hill's response, in Kelley's view, suggested that Hill would, if necessary, physically interrupt the investi-

gation: "[H]e looked directly at me, he placed his hands on his hips and in a very bold manner, said, yes. Why don't you pick on somebody my size?" It was at this point that Kelley arrested Hill for violating the ordinance.[2]

## II

One can view this difficult speech case through either of two classic prisms of First Amendment law. It can be argued in balancing terms that the city's interest in insuring the safe execution of lawful arrests outweighed any speech interests of Hill, *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), and it can be argued as well, in categorical terms, that Hill was not engaging in protected speech. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). As will be seen, the distinctions between the two lines of analysis have been blurred somewhat, but under either approach I would conclude that the ordinance was constitutionally applied to Hill.

–1–

I do not doubt that the First Amendment protects Hill's right to express publicly his opposition to police actions such as Officer Kelley's interrogation of the black man. Nor is that right limited to communications addressed to passers by; it includes petitions directed to police officers themselves, for the cop on the street undeniably functions as a representative of government. But our rights to speak or petition are not absolute, and may constitutionally be limited pursuant to regulations that are content-neutral and restrict only the time, place and manner of speech. *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). I interpret Houston's prohibition on interference with police officers as such a restriction,[3] and accordingly, test its application by balancing the interests at stake. *See Konigsberg v. State Bar of California*, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961). *Compare id.* at 57–80, 81 S.Ct. at 1010–1022 (Black, J., dissenting). The test to be applied is clear. We balance the government interests furthered by this suppression of speech against the speech interests affected, considering both the significance of the governmental objective and alternative forums for dissemination of the protected expression. *See, e.g., Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).

Applying the first part of the test, it cannot be doubted that the City of Houston has a legitimate interest in prohibiting interference with its police officers while they are pursuing lawful investigations or executing lawful arrests. The City's interests here are not limited to facilitating law enforcement; they extend as well to promoting the safety of its officers and the safety of those persons who are lawfully detained or arrested. I do not suggest that citizens must submit to public authorities like docile lambs, for as Justice Douglas has observed, "at the constitutional level speech need not be a sedative; it can be disruptive." *Colten v. Kentucky*, 407 U.S. 104, 122, 92 S.Ct. 1953, 1963, 32 L.Ed.2d 584 (1972) (Douglas, J., dissenting). But the context of arrests and investigations is

---

**2.** Of course Hill's version of the incident is somewhat different, but the court below found Kelley's version of the incident to be more credible. Although he did not make detailed findings, Judge DeAnda did conclude that Hill's language was abusive and that he provoked the officers into making the arrest. I am not prepared to hold that these factual findings are clearly erroneous; the record amply supports these conclusions.

**3.** I address possible constructions of the ordinance *infra* in Section III. For now it is necessary to point out only that the ordinance, to the extent the City applies it at all to verbal conduct, is not a restriction on any particular message, whether addressed to the public or police authorities. Rather, the ordinance restricts interference with police officers in the course of execution of their duties, and rights of speech are limited only to the extent that speech might be used to create such interference. Since the restriction is content-neutral, it is proper to apply a balancing test. *Heffron v. International Society For Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981).

a serious one, and challenges or annoyances that might otherwise be an appropriate means of voicing opposition to authorities, in that setting, present risks that may well be unacceptable when the constitutional balance is struck. Surely in that context the City has an interest in insuring that its officers can pursue their work without interference, whether caused by force or speech.

The Court addressed a nearly identical situation in *Colten v. Kentucky, supra.* Colten was arrested under a disorderly conduct statute when he insisted on remaining at the scene of a traffic citation, despite police requests that he move on. Although Colten claimed that the First Amendment protected his right to advise the man who was getting the citation and his efforts to help arrange transportation for the driver and his passengers, the state courts found that his only purpose was to aggravate, harass, and inconvenience the police as they issued the ticket, and accordingly sustained his conviction. The Supreme Court affirmed, and in dismissing the First Amendment defense stated that:

> [Colten] had no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation at that time. The state has a legitimate interest in enforcing its traffic laws and its officers were entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction. Here the police had cause for apprehension that a roadside strip, crowded with persons and automobiles, might expose the entourage, passing motorists, and police to the risk of accident.

*Id.* at 109–10, 92 S.Ct. at 1957.

Similar risks were present when Hill challenged Officer Kelley on the Montrose streetcorner. Whether or not Hill would have actually assaulted Officer Kelley had he not been arrested is unimportant—his threatened disruption was sufficient, as it was intended to be, to prevent Kelley from pursuing his investigation. He testified that Hill's challenge, one which might ordinarily have appeared harmless, seemed quite threatening, offered as it was in front of a converging crowd. Kelley explained that he "felt apprehensive towards the crowd because of Mr. Hill" and that he perceived the crowd as a threat to his own safety, that of his detainee, and that of his partner who was issuing a traffic citation nearby. It is not surprising, then, that Kelley was unwilling simply to turn his back on Hill and pursue his investigation.

In contrast, the speech interests at issue here are far from compelling. First, there are many times and places where the actions of law enforcement officials may be challenged; to restrict challenges made in the context of arrests or investigations does not significantly limit the opportunity for such speech. But more importantly, I do not construe the Constitution to require an officer to adopt a "wait and see" attitude when threats interrupt an investigation or arrest. Certainly there is little reason to protect speech whose only purpose is, as here, to distract a police officer in the performance of his duties. Hill conceded at trial that he was not trying to address the crowd or to persuade Kelley to release the black man. He admitted that his purpose was to divert Kelley's attention from his detainee and to substitute himself as the arrestee if necessary because Hill feared the black man might become the victim of police violence. There is little, if any, factual basis to support the contention that such risks were present, however, and the assertion does not bolster Hill's speech claim. Indeed if the prevention of violence was Hill's purpose, any contention that he was disseminating information to the crowd rings hollow.

In short, I would conclude that in this particular context, Hill's arrest for his speech was constitutional. There is no speech interest here that is not plainly outweighed by the City's interests.

–2–

Relatedly, I would conclude that Hill's speech was, in categorical terms, not entitled to First Amendment protection. In

*Chaplinsky* Justice Murphy explained that the Constitution does not protect speech irrespective of its content:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the breach. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly out weighed by the social interest in law and morality.

315 U.S. at 571–72, 62 S.Ct. at 769.

The *Chaplinsky* analysis entails the risk of giving short shrift to speech which, although offensive and provoking, is nonetheless speech-laden. That speech is provocative or challenging cannot alone reduce its protection. Heated exchange and questioning of authority are part and parcel of the courts' subscription to John Milton's ideal of a marketplace for ideas, regardless of the historical accuracy of that subscription. *Abrams v. United States*, 250 U.S. 616, 624, 40 S.Ct. 17, 20, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *Terminiello v. Chicago*, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). There remains, nonetheless, a narrow band of speech which is so without content or social value as to be unprotected.

We distinguish this narrow band, despite the seeming crudity of the categorical approach, because the approach is not wholly categorical in operation. Under the *Chaplinsky* analysis, as currently defined by the Court, we look to context as well as content to define "fighting" words. *See, e.g., Lewis v. New Orleans*, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972) (opinion of Powell, J.). The necessary look to the context of the speech, that must follow a look at the words themselves, is not only reflec-

tive of the Court's case-specific sensitivity, but also contains an element of balancing speech and state interests, if in different terms. In other settings, for example, the epithet "Goddamned racketeer," used by the Jehovah's Witness in *Chaplinsky*, might have provoked no response, much less a fighting one, and there would have been no cause to arrest the speaker.

This is arguably a definitional problem, because the *Chaplinsky* construct can be seen as applying only to cases where the risk of violence or other harm is presented by the choice of words, leaving cases such as this to the predictive inquiry of a "clear and present danger" analysis of the words laid in context. *See Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). But even when we look to context, the *Chaplinsky* analysis plays a vital role. Where, as here, the purpose of the speech is shown to be interference with a police officer by challenging him to fight, First Amendment values are only attenuated by elaborated analysis. Such statements are, in my view, "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in law and morality." *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. at 769. I would conclude that Hill's speech, considering both its content and the context of its utterance, was not entitled to First Amendment protection. *See FCC v. Pacifica Foundation*, 438 U.S. 726, 742–51, 98 S.Ct. 3026, 3036–41, 57 L.Ed.2d 1073 (1978).

### III

Nor do I find the challenged ordinance unconstitutionally overbroad. It provides:

> *Sec. 34–11. Assaulting or interfering with policemen.*
>
> (a) It shall be unlawful for any person to assault, strike *or in any manner oppose, molest, abuse or interrupt* any policeman in the execution of his duty, or any person summoned to aid in making an arrest (emphasis added).

The majority concludes that the provision on its face bans a substantial amount of

protected speech and accordingly holds the ordinance unconstitutional. Although the ordinance is undeniably overbroad, I would stress more heavily than does the majority the importance of the Court's command in *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), that a restriction must abridge a substantial amount of protected activity before the First Amendment is offended. The ordinance is possibly subject to constructions which would limit its overbreadth, so that, at the least, it could not be said to be substantially overbroad. I would leave possible unconstitutional applications of the statute to be resolved if and when they in fact arise.

–1–

The doctrine of overbreadth is rooted in the notion that where conduct protected by the First Amendment may be chilled by the literal sweep of an overbroad statute, adjudication on a case by case basis which might avoid constitutional problems is unacceptable. But consideration of possible limiting constructions for a statute that might alleviate some or all of its potential problems is always appropriate, even where the constitutional challenge is one of overbreadth. *See, e.g., Broadrick*, 413 U.S. at 617, 93 S.Ct. at 2918. The majority errs in eschewing any attempt to limit the sweep of the City's ordinance.

Although the majority is correct that the courts of Texas have not yet put a limiting construction on the challenged provision, it is not because they have refused to do so but because they have not yet had an opportunity to do so. Those who violate the ordinance are tried in the municipal courts for the City of Houston, which have recently been made courts of record. There is now an appeal as of right from those courts to the county criminal court and thereafter to the state courts of appeal. *See* Tex.Rev.Civ.Stat. art. 1200cc §§ 1(a), 7, 21 (Vernon Supp.1985). The notion that we are bound by authoritative state court constructions of a statute, *see, e.g., New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 3361 n. 24, 73 L.Ed.2d 1113 (1982), logically

has no application until the state courts actually *do* give it some construction. Thus, I do not share the majority's aversion to proffering, sua sponte, possible limiting constructions for the ordinance. Contrary to the suggestion of the majority, I would not impose a construction of the ordinance upon the City. Rather, I believe that inquiry into the plausibility of constructions that the City might make is relevant to the inquiry into substantiality. Indeed, both principles of federalism and our aversion to deciding constitutional questions when they can be avoided suggest that we *ought* to proffer such constructions where possible, and assume that the state courts will construe the ordinance "consistently with the constitutional command." *See Time, Inc. v. Hill*, 385 U.S. 374, 397, 87 S.Ct. 534, 547, 17 L.Ed.2d 456 (1976). The majority apparently refuses to recognize the possibility that the state courts may yet limit the sweep of the ordinance if they are not denied the opportunity.

While the ordinance on its face is susceptible to the troubling constructions posed in the majority's hypotheticals, it need not be so construed. The state courts could, for example, imply an intent requirement in the ordinance so as to prohibit only that conduct, verbal or non-verbal, that is intended to and actually does interfere with ongoing police activities. Thus trivial, insignificant, or unintended "interruptions" might not be proscribed. Nor need the ordinance be construed as applicable to all police functions—indeed its last clause suggests that the ordinance might be intended to operate only in the context of arrests or detentions. It certainly could be limited to *lawful* police functions, so that public challenges to unauthorized police activities would be unaffected.

I do not attempt to give the regulation a definitive construction here, but I think it may safely be assumed, for purposes of our inquiry into the *substantiality* of the ordinance's overbreadth, that it could be limited, to the extent it applies at all to speech, to intentional interferences with ongoing police work that is not unlawful,

whether that interference is achieved with speech or conduct. As suggested above, a City ought to be able to prohibit conduct, even so-called "pure speech," when it interferes with police to such an extent that they can no longer carry out their duties, and undoubtedly that this is all the City of Houston seeks to achieve here. While the prosecution of such conduct or speech may yet pose some constitutional problems—indeed, there is likely no limiting construction of the ordinance which would confine its reach to completely permissible proportions—the possibility of such a limiting construction is relevant to the required inquiry into whether the ordinance is *substantially* overbroad. It is to that issue that I now turn.

### –2–

In *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Court tightened the restrictions on the doctrine of overbreadth. An Oklahoma statute prohibited certain of the state's civil employees from participating in partisan political activities, and the law was challenged on First Amendment grounds. The Court recognized that "some persons' arguably protected conduct [might] be caught or chilled by the statute," *id.* at 618, 93 S.Ct. at 2919, but nonetheless found the provision constitutional. Justice White explained:

> Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that it is admittedly within its power to proscribe.... To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, when judged in relation to the statute's plainly legitimate sweep.

*Id.* at 615, 93 S.Ct. at 2917–18. The Court made clear in *New York v. Ferber, supra,*

that the substantiality requirement in overbreadth analysis is not limited to expressive *conduct* but applies as well where so-called "pure speech" is regulated. Indeed, the Court relied on the substantiality requirement to uphold the child pornography law challenged in *Ferber.*

The substantiality requirement has by no means eviscerated overbreadth analysis, however, for as the majority describes, the Court has sustained overbreadth challenges since *Broadrick. See Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). What can be gleaned from these applications of the *Broadrick* formulation is that it yet leaves courts with a broad judgment—so broad that it now is almost inevitably a case-specific inquiry. Ironically, since there is not a more clearly stated constitutional test, it is a case by case inquiry that determines whether a statute will be read on a case by case basis. In short, whether a statute will be struck necessarily mirrors intuitive judicial valuations in such a conclusory fashion as to give little guidance and escape necessary critique. There are, however, informing concerns that, in my view, mitigate this difficulty.

First, substantiality is a reconciliation of competing constitutional values. Striking down a statute that has at its core permissible inhibitory functions because it might be construed to apply to conduct protected by the First Amendment is in tension with our constitutionally footed devotion to the decision of actual cases. As Justice White explained in *Broadrick,* the traditional rule is "that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." 413 U.S. at 610, 93 L.Ed.2d at 2915. This limitation is based on Article III's command that we decide only actual cases or controversies, the personal nature of constitutional rights, and

prudential limitations on constitutional adjudication. *Ferber*, 102 S.Ct. at 3360.

The exception permitted for First Amendment overbreadth challenges by parties such as Hill, whose conduct is *not* protected, is predicated upon the "chilling" problem in speech cases—the fear that an overbroad statute might never be challenged because those who could properly raise the issue cannot be expected to adjudicate their own rights. *Broadrick*, 413 U.S. at 612–13, 93 L.Ed.2d at 2915–16. The substantiality requirement does much to alleviate this tension, for it recognizes that application of the overbreadth doctrine is "manifestly strong medicine," and insures that it will in fact be applied "sparingly" and "as a last resort." *Id.* at 613, 93 L.Ed.2d at 2916. In short, the requirement of substantiality accommodates our constitutional devotion to the decision of concrete cases, as well as our devotion to separation of powers and federalism.

Thus while I agree with the majority that Hill has standing to raise an overbreadth challenge,[4] because his challenge rests on the ordinance's application to hypothetical persons in hypothetical cases, the substantiality requirement ought to be applied stringently. A diluted substantiality requirement expresses a perceived primacy of First Amendment values over Article III checks of judicial power and defined judicial roles, and in doing so, eschews what I see to be a fundamental analytical tool of constitutional adjudication—that of structural inference, text and history. I find nowhere in constitutional text a justification for slighting our devotion to deciding only presented cases. Although in saying this, I have implicitly expressed my skepticism of the chilling effect upon others who might fear to exercise speech rights, I recognize that in some cases such a chilling

effect can be quite real. Its presence will be signalled by objective facts, however, such as the level of penalty, the spontaneity of the anticipated speech to be chilled, and the opportunity to contest the application of the statute. When, as here, the penalty is a misdemeanor and the constitutionality of its application can be raised defensively, the risk of a chilling effect is lessened. Nor have I found those who question such laws to be at all reluctant to walk through the wide doors of our federal courthouses.

Second, substantiality is informed by the character of the regulation. When, as here, the statute is inhibitory and noncensorial in its operation, we ought to be more willing to leave its hypothetical applications to other concrete cases. *See Broadrick*, 413 U.S. at 616, 93 S.Ct. at 2918. As discussed above, First Amendment concerns are mitigated somewhat when the regulation does not rest on an unacceptable valuation of the content of the speech either in a direct or discriminatory way. Of course, there are permissible valuations in the sense of multi-tiered valuations, *see FCC v. Pacifica*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1980); *Ferber*, 102 S.Ct. at 3365–68 (Stevens, J., concurring), and to the extent that this ordinance can be characterized as such, there is even less reason to find it overbroad. As explained above, the ordinance, to the extent that it applies at all to verbal conduct, can be construed to proscribe only speech which is not made with a bona fide intention to exercise a constitutional right, but solely with the intention of interfering with police officers who are attempting to carry out lawful police functions, and which actually does create such interference. As with the disorderly conduct statute at issue in the *Colten* case, *supra*, the ordinance "comes into operation only where the individual's

---

4. I find troubling, however, the majority's suggestion that Hill has standing to challenge the ordinance on vagueness grounds as well. There is no cause to relax principles of *jus tertii* when the constitutional challenge is based on vagueness rather than overbreadth, for the problem with a vague statute is not its chilling effect, but its infringement on personal rights of notice and fair trial. It is only when a statute is perfectly vague, that is, vague in all of its potential applications, that vagueness becomes a problem for the First Amendment. Thus to prevail on a claim of vagueness, a litigant must ordinarily demonstrate that the statute in question is vague as applied to *his own* conduct, without regard to its potentially vague applica-

tion to others. *See, e.g., Parker v. Levy*, 417 U.S. 733, 753–58, 94 S.Ct. 2547, 2560–62, 41 L.Ed.2d 439 (1974); L. Tribe, *American Constitutional Law* § 12–29 (1978).

Hill was intimately familiar with the ordinance and how it was applied by the Houston police prior to his 1982 arrest, and indeed was questioned by Officer Kelley regarding his intent to interfere before Kelley arrested him. Thus Hill has no standing to raise a vagueness challenge, and the majority's suggestion that he does blends the standing rules applicable to overbreadth and vagueness, doctrines we have heretofore kept distinct. *See, e.g., Ferguson v. Estelle*, 718 F.2d 730, 734–35 (5th Cir.1983).

interest in expression, judged in light of all relevant factors, is 'miniscule' compared to the public interest in preventing expression or conduct at that time and place." *Colten*, 407 U.S. at 111, 92 S.Ct. at 1958. As with the statute in *Colten*, the potential reach of this ordinance does not seriously threaten the constitutionally protected conduct of others; certainly it does not present such a threat that we must strike it down as *substantially* overbroad.

### IV

In sum, the record convinces me that the Houston ordinance was constitutionally applied to Raymond Hill for his conduct on the Montrose streetcorner, and his challenge to the provision cannot be sustained on that ground. Nor is his attack sustainable on the ground that the ordinance threatens the constitutional rights of others. In my view an interpretation of the ordinance that would confine its application to constitutional proportions is possible, and we should give the courts of Texas a chance to so limit it. So construed, the ordinance does not substantially abridge protected speech, and we should leave as yet undemonstrated constitutional problems for another day. At the least this course allows the ordinance to be trimmed pro tanto as its perceived overbreadth finds actual cases and gives expression to the reality that courts are ill-suited to resolve hypothetical issues and are constitutionally enjoined to decide only concrete cases.

## ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC

Before CLARK, Chief Judge, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL, and JONES, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the suggestion for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.