Raymond Wayne HILL,
Plaintiff-Appellant,

v.

The CITY OF HOUSTON, TEXAS,
Defendant-Appellee.

No. 84–2181.

United States Court of Appeals,
Fifth Circuit.

May 14, 1986.

Michael A. Maness, Houston, Tex., for plaintiff-appellant.

Bruce V. Griffiths, Houston, Tex., James C. Harrington, Austin, Tex., for Greater Houston, etc. et al.

Mark Elvig, Asst. City Atty., Roy F. Martin, III, Senior Asst. City Atty., Houston, Tex., for defendant-appellee.

Before CLARK, Chief Judge, THORNBERRY, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL, and JONES, Circuit Judges.*

ALVIN B. RUBIN, Circuit Judge:

A Houston, Texas ordinance makes it a misdemeanor not only to assault but also to "in any manner oppose, molest, abuse or interrupt" a police officer in the execution of his duty. An individual who has been arrested several times for violating the ordinance, and who has never been found guilty, challenges its constitutionality as violating his right to freedom of speech. We hold that the plaintiff has standing to challenge the constitutionality of the ordinance, and that the ordinance in its present form is facially and substantially overbroad and, therefore, unconstitutional. We reverse the judgment of the district court insofar as it upheld the constitutionality of the ordinance and remand for the award of appropriate relief to the plaintiff. Based on the district court's findings of fact, we reject all the rest of his claims.

I.

Section 34–11(a) of the Code of Ordinances of the City of Houston, Texas, provides:

Sec. 34–11. *Assaulting or interfering with policemen.*

(a) It shall be unlawful for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his

---

* Judge Tate did not participate in the decision of this case.

duty, or any person summoned to aid in making an arrest.

Violation of the Ordinance is a Class C misdemeanor, punishable upon conviction in the Municipal Court of the City of Houston by a fine not to exceed $200.00.

While Houston Police Department officers J.L. Kelley and R.D. Holtsclaw were making a traffic arrest at the intersection of Westheimer and Whitney streets in Houston, they noticed Charles Hill, who is unrelated to the plaintiff, directing traffic and stopping vehicles, including a city bus, in a heavily travelled lane of traffic on Westheimer. Officer Kelley approached Charles Hill and began speaking with him about his behavior. The testimony about what happened next is conflicting. Raymond Hill testified that, after a short conversation between Officer Kelley and Charles, Charles attempted to leave, but Officer Kelley grabbed him by the shoulder and began yelling at him. Raymond further testified that, after Officer Kelley permitted Charles to leave, Kelley chased him, and, upon catching him and being joined by his partner, challenged Charles to fight.

Officer Kelley testified that Charles's actions were "extremely erratic.... He was twitching all of the time.... I didn't know if he was about to have a seizure or if he was being insolent or what." Before Kelley could determine the cause of Charles Hill's behavior, Charles began walking away. Kelley tried to stop him but Charles continued walking so Kelley took him by the arm and stopped him. The district court rejected Raymond's testimony, and found that "Officer Kelley approached Charles Hill and began speaking with him." This finding is fully supported by the record.[1]

By this time a crowd had gathered. Raymond, who was standing in front of the crowd, about seven or eight yards from them, yelled to the policemen, in an admitted attempt to divert their attention from Charles, "Leave him alone. Why don't you pick on somebody your own size?" or words to that effect. Raymond's statements were unaccompanied by any menacing or threatening gesture, although Officer Kelley characterized the tone of his speech as "loud" and "boisterous." Kelley testified that he interpreted Raymond's remarks as somewhat threatening because of their tone, but there is no evidence to support the district court's finding that Raymond "shout[ed] abuses" at Officer Kelley.

According to Officer Kelley's testimony, after Raymond yelled to him, Kelley turned towards Raymond and asked, "Are you interrupting me in my official capacity as a Houston police officer?" He testified that Raymond, who was standing with a crowd of people behind him, put his hands on his hips and replied, "Yes. Why don't you pick on somebody my size?" Officer Kelley then arrested Raymond and charged him with violating the ordinance. After a trial in municipal court, Raymond was found not guilty for reasons that have not been preserved in a record.

Raymond Hill's arrest was neither his first encounter with the criminal law nor the first time he had been charged with violating the ordinance. At the time, he was forty-one years old and a resident of Houston, Texas. After serving five years in the state penitentiary for burglary convictions, Hill had returned to Houston in 1975 and helped form the Houston Gay Political Caucus. He has since been a vocal advocate of the homosexual cause and was on the Caucus' Board of Directors at the time of trial. In addition to employment as a paralegal, he also did radio shows for a local community service broadcasting station and, accordingly, carried a press badge.

Twice before and once after his February 14, 1982 arrest, Hill was charged with violating the challenged ordinance, although he has never been convicted. Hill testified that he made a practice of deliberately confronting policemen engaged in making arrests. He was disturbed by what he per-

---

1. *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765 (1948); *Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487, 489 (5th Cir.1985).

ceived to be police harassment of homosexuals, and he testified that he would prefer to be arrested himself rather than see the arrest of persons whose careers might be damaged. He added, "I am prepared to respond in any legal, nonaggressive or nonviolent way, to any illegal police activity, at any time, under any circumstances."

Hill filed this suit, under 42 U.S.C. § 1983, claiming that his arrest was illegal and seeking money damages from the city of Houston and the arresting officers; he also sought expungement of his arrest record, injunctive and declaratory relief, and attorney's fees. He contended that he was arrested for exercising his right of free speech. He also contended that, regardless of the particulars of his own arrest, enforcement of the ordinance should be enjoined or the ordinance declared invalid because it is unconstitutionally vague and because its potential for application to protected speech renders it unconstitutionally overbroad. Before trial and by agreement, all claims against the two officers were dismissed and the City withdrew its jury demand. After a bench trial, the district judge rejected the constitutional attacks, upheld the arrest, and entered a judgment for the City. On appeal, a divided panel of our court voted to reverse and remand.[2] The panel majority did not decide whether the ordinance was unconstitutionally vague or whether, as applied, it denied Hill's right of free speech. We took the case en banc and now review the judgment of the district court.

## II.

Article III of the Constitution establishes a jurisdictional threshold to be crossed by any citizen who would challenge the constitutionality of a statute. An actual case or controversy must be alleged. "Standing" is one element of the "case or controversy" limitation on federal court jurisdiction, and focuses primarily "on the party seeking to get his complaint before a federal court."[3] "The gist of the question of standing" as the Supreme Court said in *Baker v. Carr*, is whether the plaintiff has alleged "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions."[4] The district court found that Hill had "not succeeded in raising any valid First Amendment claims," and, on this basis, denied him standing to pursue his claim.

The usual standing rule is clear: "[O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional."[5] When the challenge is based on the first amendment, however, different considerations apply. As explained by the Supreme Court:

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, where there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. "Litigants, therefore, are permitted to challenge a statute not because their own

2. 764 F.2d 1156 (5th Cir.1985).

3. *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947, 961 (1968).

4. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 677 (1962); *KVUE, Inc. v. Austin Broadcasting Corp.*, 709 F.2d 922, 927–28 (5th Cir.1983), *aff'd*, 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984).

5. *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524, 529 (1960); *see also Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700, 710–11 (1982).

rights of free expression are violated, but because of a judicial predication or assumption that the statute's very existence may cause others not before the court to refrain from protected speech or expression." [6]

Hence, courts have allowed plaintiffs in suits for declaratory or injunctive relief to raise first amendment challenges to statutes because of their alleged overbreadth or vagueness.[7]

■ Hill clearly had sufficient standing to question the facial validity of the ordinance. Hill's record of arrests under the ordinance and his adopted role as citizen provocateur made his article III standing to seek injunctive and declaratory relief certain.[8]

### III.

■ The language of the ordinance is not enigmatic. Read on its face, the conduct proscribed includes opposing, molesting, abusing, or interrupting a policeman in the execution of his duty "in any manner." Although the trial court found that Hill had not proved that the ordinance has in fact been unconstitutionally applied, either to him or to others, and this finding of fact is not challenged on appeal, the issue before us is whether there is a substantial likelihood that the ordinance as interpreted by the City will deter constitutionally protect-

ed conduct. In deciding this, we look not only to the words of the ordinance but the manner in which the City has construed it. The City itself has entitled the ordinance "Assaulting *or* interfering with policemen" —words that might be broadly interpreted. The City does not interpret the ordinance as applying only to an assault on a policeman or to willful interference with a policeman that obstructs the execution of his duties, but has insisted on the validity of the ordinance as literally read. The constitutionality of such an ordinance cannot be determined by looking only to the described kinds of conduct that the City may constitutionally proscribe, such as assaulting a policeman. Instead, we must also evaluate those parts of the ordinance that purport to, and may in actual practice be used to, punish only the verbal and expressive acts of objecting in a nonviolent manner to a policeman's conduct, of annoying a policeman, or addressing him in terms that he might consider abusive, of unintentionally disturbing a policeman, and even of unwittingly interrupting him.

The plaintiffs offered evidence of over 200 arrests that had been made for violation of the ordinance between November 1981 and March 1982. Violations are apparently so frequent that the City uses a printed form to report charges. The form reads:

6. *Secretary of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956–57, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786, 795 (1984) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830, 839 (1973)); *see also Gooding v. Wilson,* 405 U.S. 518, 520–21, 92 S.Ct. 1103, 1105–06, 31 L.Ed.2d 408, 413–14 (1972); *Coates v. Cincinnati,* 402 U.S. 611, 619–20, 91 S.Ct. 1686, 1691, 29 L.Ed.2d 214, 220–21 (1971) (White, J., dissenting).

7. *See, e.g., Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 957–58, 104 S.Ct. 2839, 2847–48, 81 L.Ed.2d 786, 795–97 (1984); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 633–35, 100 S.Ct. 826, 834–35, 63 L.Ed.2d 73, 85–86 (1980);

*Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895, 906 (1979); *Broadrick v. Oklahoma,* 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830, 839–40 (1973); *Dombrowski v. Pfister,* 380 U.S. 479, 486–87, 85 S.Ct. 1116, 1120–21, 14 L.Ed.2d 22, 28–29 (1965); *KVUE, Inc. v. Austin Broadcasting Corp.,* 709 F.2d 922, 927–31 (5th Cir.1983), *aff'd,* 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984). *Cf. United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

8. *Cf. Ellis v. Dyson,* 421 U.S. 426, 434–35, 95 S.Ct. 1691, 1696, 44 L.Ed.2d 274, 282–83 (1975).

| Officers Names | Badge No. | Court Day | Hour |
|---|---|---|---|

IN MUNICIPAL COURT
CITY OF HOUSTON
HARRIS COUNTY, TEXAS

CAUSE NO. _____

# COMPLAINT

THE STATE OF TEXAS
vs.
_____

Arrest No. _____

Filed the __ day of _____, 19__

Deputy Clerk, Municipal Court

WITNESSES:
_____
_____
_____
_____
_____
_____
_____

| Attorney | Phone |
|---|---|

Address

| Amt. Bond | Date Set | Hour | Court No. |
|---|---|---|---|

| Receipt No. | Initials |
|---|---|

**INTERRUPTING A POLICEMAN**
Form No. JC-0038

| Social Sec. No. | Race | Sex |
|---|---|---|

| Defendants Name | Age |
|---|---|

Address

| Place of Arrest | Time |
|---|---|

| Arresting Officers | Badge No. |
|---|---|

JUDGMENT RECORD—COURT MINUTES
IN CAUSE NO. _____
**THE STATE OF TEXAS**
vs.

Date _____, 19__

This day this cause was called for trial, and both parties appeared, announced ready for trial, and the defendant pleaded _____ guilty _____ to the accusation in the complaint and waived _____ a trial by jury, and the court _____ having heard the evidence is of the opinion that the defendant is _____ guilty as charged. It is therefore ordered, adjudged and decreed that the State of Texas, for the use and benefit of the City of Houston, Texas, do have and recover of the defendant the sum of $_____, for which execution will issue, and in default of payment, that the defendant be committed to jail until said fine is paid.

Judge, Municipal Court, Houston, Texas
_____
_____
_____
_____
_____
_____

---

**COMPLAINT: INTERRUPTING A POLICEMAN**
City Code Sec. 34–11          Penalty: Not To Exceed $200.00

---

**In the Name and by Authority of the State of Texas:**

I, the undersigned affiant, do solemnly swear that I have good reason to believe, and to believe that _____ on or about the ___ day of _____, 19__, and before the making and filing of this complaint, within the incorporated limits of the City of Houston, in the County of Harris, and State of Texas, did then and there wilfully or intentionally interrupt a city policeman, to-wit: _____ while said policeman was in the execution of his duty, in the _____ block of _____ Street, by _____ during an investigation being conducted by said policeman.

Against the peace and dignity of the State.

Affiant: _____

Subscribed and sworn to before me by affiant this ___ day of _____, 19__

_____
Notary Public, Houston, Harris County, Texas

---

The printed form reveals how the City officials interpret the ordinance. The form is not designed to be used for charges of assaulting or striking a policeman or for the charge of obstructing the police in the execution of their duties. It is, instead, a complaint for simply "Interrupting a Policeman." Although the ordinance itself does not require any specific intention, the complaint form seeks to remedy that evident defect: it inserts the additional words that the accused *"Wilfully* or *intentionally* interrupt[ed] a city policeman."

The list of charges offered in evidence shows the descriptive words used by the arresting officer on the charge form. These words do not necessarily describe with accuracy the conduct involved. Indeed, in Hill's case and the four others on which evidence was taken in the district court, they do not. But the list is nevertheless instructive because it provides examples of the kinds of activity that the city characterizes as offenses under the ordinances. In the majority of the cases listed, the charge made by the police describes conduct that is patently unlawful. In many instances, however, the malefactor is described as having done nothing more offensive to the public order than speaking or failing to remain silent. According to the charges listed in the appendix, the ordinance was invoked against what is described as "refusing to move on," "talking," "cursing," "interrupting," arguing with the police, and even "shooting the finger" at an officer. The list of charges demonstrates that the ordinance is officially regarded as penalizing the mere interruption of a policeman while in the line of duty. The City apparently sees no problem in characterizing "talking" and "arguing" as offenses under the ordinance. Though the ordinance obviously carries unnecessary words ("in any manner oppose"), the City has stood its ground, kept the language intact, and fought this lawsuit for years.

■ The ordinance plainly encompasses mere verbal as well as physical conduct. In such a situation, as the Supreme Court said in *Members of the City Council v. Taxpayers for Vincent,* [9] "where the statute unquestionably attaches sanctions to protected conduct, the likelihood that the

9.   466 U.S. 789, 800 n. 19, 104 S.Ct. 2118, 2126 n. 19, 80 L.Ed.2d 772, 784 n. 19 (1984) (citing *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 217, 95 S.Ct. 2268, 2276–77, 45 L.Ed.2d 125 (1975)).

statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack." The areas of protected conduct encompassed by the ordinance are more than mere "marginal applications in which the statute would infringe on First Amendment values."[10] A significant range of protected speech and expression is punishable and might be deterred by the literal wording of the statute.

█ The real issue in this case, therefore, is only whether the overbreadth of the ordinance is or is not "substantial," the test applied in Justice White's opinion for the Court in *Broadrick v. Oklahoma.*[11] The Court in *Broadrick* warned that the application of the overbreadth doctrine is "strong medicine" and it is to be employed "sparingly and only as a last resort."[12] A statute is not unconstitutionally overbroad unless "the overbreadth of [the] statute is not only ... real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."[13]

*Broadrick* imposes stringent requirements that must be satisfied before a statute will be struck down as facially invalid, and a federal court, obedient to its mandate, should not hold a law unconstitutional merely because the law might, in some hypothetical or conjectural fashion, be construed to encroach on activities protected by the first amendment. If, however, *Broadrick's* requirements are met, particularly when the City's interpretation of an ordinance demonstrates that its threat is real, not fanciful, overbreadth remains a basis for constitutional challenge. Since *Broadrick*, therefore, the Court has sustained a number of overbreadth challenges,[14] acknowledging that "the concept of 'substantial overbreadth' is not readily reduced to an exact definition."[15]

█ There is a realistic danger of, and a substantial potential for, the unconstitutional application of the ordinance. Of the 231 charges offered in evidence, 42 resulted in forfeiture of a bond and 55 resulted in dismissal of the charges. Of the accused, 134 were found guilty and fined, but only seven fines were over $100, the minimum fine from which appeal to the state courts of appeal is permitted.[16] Thus, the charges against 24% of the accused were dismissed and, for reasons that may turn on inconvenience more than guilt, 18% of the accused merely forfeited a bond.

Many persons who might otherwise speak are likely to be silenced by the policeman's threat to invoke his authority. The fact the ordinance punishes as misdemeanors its violations and limits fines to $200 does not diminish the chill the enforcement of the ordinance creates. The real penalty is a trip to the city jail in the back of a squad car and having to post bond even if one later protests the charge and is found innocent. If one is found guilty, the additional penalty is a misdemeanor on his record for assaulting or interfering with a policeman. Like the vagrancy ordinance held unconstitutional in *Papachristou v. City of Jacksonville,*[17] the ordinance "set[s] a net large enough to catch all possible offenders," improperly leaving "it to the courts to step inside and say who could be rightfully detained, and who

10. *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439, 460 (1974).

11. 413 U.S. 601, 615, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830, 841 (1973).

12. *Id.* at 613, 93 S.Ct. at 2916, 37 L.Ed.2d at 840.

13. *Id.* at 615, 93 S.Ct. at 2918, 37 L.Ed.2d at 841.

14. *See, e.g., Federal Election Comm'n v. National Conservative PAC,* — U.S. —, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985); *Secretary of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).

15. *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772, 783 (1984).

16. Tex. Gov't Code Ann. § 30.278 (Vernon 1985).

17. 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

should be set at large." [18] The ordinance places virtually "unfettered discretion in the hands of the [Houston] police." [19]

## IV.

The ordinance requires no *mens rea*. It may be violated whether or not the accused intended to interfere with or oppose a policeman. The ordinance requires no warning to the possible offender that he may be interfering with or molesting a police officer. The ordinance has never been limited by any state court and the City itself has not suggested any interpretation that this court might use,[20] had it authority to do so. Refusing either to amend the ordinance or proffer a limiting instruction, the City has insisted on its validity as literally read.

The likelihood of a challenge to the ordinance in Texas state court is remote. Under Texas law a conviction of this misdemeanor is likely to be resolved at the county court level. Texas law provides no opportunity to attack the unconstitutionality of the ordinance, other than by direct appeal of a conviction, without the showing of irreparable injury to a vested property right. Absent that showing, no injunction or mandamus or declaratory judgment action may succeed in Texas courts.[21]

The ordinance has been in force since 1956 and has never been interpreted by any Texas court of record. Indeed, the constitutionality of the ordinance has been virtually immune to challenge by persons arrest-

ed under or intimidated by it. Before 1976, a defendant convicted in a municipal court of violation of a municipal ordinance had the right to appeal to the county court,[22] where he was entitled to a trial de novo.[23] If the defendant were found guilty in county court and were fined more than $100, he had the right to appeal to the Court of Criminal Appeals. In 1976, the Texas legislature made the Houston Municipal Court a court of record, and defendants convicted in municipal court then had the right to appeal to the county court on the record, rather than de novo.[24] If the county court affirmed the municipal court and the defendant were fined more than $100, he had a right to appeal to the Court of Criminal Appeals.[25] In 1981, the legislature gave the Texas courts of appeal jurisdiction over criminal appeals.[26] One convicted in a municipal court may now appeal on the record to the county court, but if he loses, his next appeal is to the court of appeals rather than the Court of Criminal Appeals and then only if his fine exceeds $100.[27]

The statutory maze is intricate but the result is simple. Despite nearly thirty years of enforcement, not one appeal to the Court of Criminal Appeals or any of Texas' fourteen courts of appeals has been reported.

## V.

█ It is textbook law that the ordinance would not be invalid for overbreadth if it were possible, applying well-established

---

**18.** *Id.* at 165, 92 S.Ct. at 845, 31 L.Ed.2d at 117 (quoting *United States v. Reese,* 2 Otto 214, 221, 92 U.S. 214, 221, 23 L.Ed. 563, 565 (1875)).

**19.** *Id.,* 405 U.S. at 168, 92 S.Ct. at 846, 31 L.Ed.2d at 119.

**20.** *Compare Federal Election Comm'n v. National Conservative PAC,* —— U.S. ——, ——, 105 S.Ct. 1459, 1471, 84 L.Ed.2d 455, 472 (1985).

**21.** *See Dearing v. Wright,* 653 S.W.2d 288 (Tex. 1983); *Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891 (Tex.1970); *see also Bean v. Town of Vidor,* 440 S.W.2d 676 (Tex.Ct.App.1969).

**22.** Tex. Code Crim.P. art. 4.08 (and its predecessors); *see Taylor County v. Jarvis,* 209 S.W. 405

(Tex.Comm'n.App.1919); *Hickman v. State,* 79 Tex.Crim.R. 125, 183 S.W. 1180 (1916).

**23.** *Cf.* Tex. Const. art. V, § 16 (amended 1978).

**24.** *See Ex parte Spring,* 586 S.W.2d 482 (1978); Tex.Rev.Civ.Stat.Ann. art. 1200cc § 7 (Vernon Supp.1985) (current version at Tex.Gov't Code Ann. § 30.269(b) (Vernon Supp.1986)).

**25.** Tex.Rev.Civ.Stat.Ann. art. 1200cc § 21 (Vernon Supp.1985) (current version at Tex.Gov't Code Ann. § 30.278 (Vernon Supp.1986)).

**26.** Tex. Code Crim.P. art. 4.03 (Vernon Supp. 1986).

**27.** *See* Tex.Gov't Code Ann. § 30.278 (Vernon Supp.1986).

principles of statutory construction, for us to construe it narrowly so that it does not forbid protected speech.[28] A federal court faced with an overbreadth challenge to a statute or ordinance certainly may and should consider whether the enactment is *"readily* subject to a narrowing construction by the state courts."[29] But a federal court may not itself provide a limiting construction of legislation that is not so readily susceptible. Here, as in *Erznoznik v. City of Jacksonville,* "the possibility of a limiting construction [by the state courts] appears remote."[30] In *Erznoznik,* the Court found the statute unconstitutional, rejecting any construction that amounted to a "rewriting of the ordinance."[31] And we need not await an interpretation by the state courts at some far-off future date that would amount to "a remarkable job of plastic surgery upon the face of the ordinance,"[32] the Court's description of an Alabama Supreme Court's "interpretation" of an ordinance that had previously been repeatedly applied.

As a federal court, we should not strain to interpret a statute in a manner that renders it unconstitutional and should, instead, attempt to read it as constitutional if its words permit. But we lack the power to tailor this city ordinance to a constitutional fit. Federal courts "do not sit as a 'super' state legislature, [and] may not impose [their] own narrowing construction onto the ordinance"[33] if the state courts have not already done so. As Justice Rehnquist has said, a statute invalid because of overbreadth must be "rewritten by the legislature or 'reinterpreted' by an authorized court,"[34] not upheld as constitutional. The principles of federalism forbid a federal appellate court to arrogate the power to rewrite a municipal ordinance. Our duty to uphold the Constitution is betrayed when we ferret out possible methods of rewriting municipal ordinances while admitting that we cannot ourselves provide a constitutional interpretation of the words before us.

No one doubts the need for an ordinance to protect police from assault, physical abuse, and from conduct that obstructs their legitimate law-enforcement activities. But the City cannot proscribe speech or other free expression that does not threaten immediate danger to the police or to legitimate law-enforcement endeavors.[35] Police "are trained to exercise a higher degree of restraint than the average citizen," Justice Powell has reminded us.[36] They are expected to be disciplined and not so thin-skinned as to arrest bystanders for remarks that pose no danger to them or to the execution of their duties. Federal law, for example, finds it adequate to prohibit persons from forcibly assaulting, resisting, impeding or interfering with certain federal

**28.** *See, e.g., Regan v. Time, Inc.,* 468 U.S. 641, ——, 104 S.Ct. 3262, 3273, 82 L.Ed.2d 487, 500 (1984) (Brennan, J., concurring and dissenting in part).

**29.** *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216 & n.15, 95 S.Ct. 2268, 2276 & n.15, 45 L.Ed.2d 125, 135 & n.15 (1975) (emphasis added); *see also Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310, 319 (1976).

**30.** 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125, 135 (1975).

**31.** *Id.* at 216, n.15, 95 S.Ct. at 2276, n. 15, 45 L.Ed.2d at 135, n.15.

**32.** *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 153, 89 S.Ct. 935, 940, 22 L.Ed.2d 162, 168 (1969).

**33.** *Beckerman v. City of Tupelo,* 664 F.2d 502, 509 (5th Cir.1981) (citing *Brown v. Oklahoma,* 408 U.S. 914, 92 S.Ct. 2507, 33 L.Ed.2d 326 (1972); *Gooding v. Wilson,* 405 U.S. at 520, 92 S.Ct. at 1105, 31 L.Ed.2d at 413).

**34.** *Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 977, 104 S.Ct. 2839, 2858, 81 L.Ed.2d 786, 808 (1985) (Rehnquist, J., dissenting).

**35.** *See, e.g., Gooding v. Wilson,* 405 U.S. 518, 524, 92 S.Ct. 1103, 1107, 31 L.Ed.2d 408, 415 (1972).

**36.** *Lewis v. New Orleans,* 408 U.S. 913, 913, 92 S.Ct. 2499, 2499, 33 L.Ed.2d 321 (1972) (Powell, J., concurring).

officers.[37] The City's interests can be served adequately by a narrowly drawn statute tailored precisely toward the conduct the City wishes to proscribe.

## VI.

Raymond Hill is an activist, a troublemaker. Neither his criminal record, his character, nor his assertiveness, however, determines the constitutionality of the ordinance before us. The Constitution does not protect only decent, law-abiding people. The first amendment was designed to shield pesky, irritating, and contentious people, even busybodies and troublemakers.

"The police, our front line soldiers in the battle against crime," our late colleague Tate once wrote, "deserve the respect and support of our officials and citizens. Nevertheless, ever since this nation fought for and obtained its freedom, it has not been a crime to curse or use opprobrious language about the public officers of our democratic republic."[38] "Freedom of speech," he continued "is protected not only for our newspapers and politicians, but also for our citizens on back streets of slum areas."[39]

For the reasons set forth above, Hill is entitled to a judgment declaring the ordinance invalid. We see no need for an injunction against its further enforcement for we are confident that the City will abide by our decision. Hill has failed to show that he sustained any actual damages as a result of his arrest. However, as the prevailing party on the issue of the ordinance's constitutionality, he is entitled to reasonable attorney's fees under 42 U.S.C. § 1988,[40] to be determined in accordance with the standards set forth in *Hensley v. Eckerhart.*[41]

For these reasons, we REVERSE the judgment of the district court and REMAND for a further proceeding consistent with this opinion.

## APPENDIX

### EXTRACT FROM EVIDENCE OF CHARGES MADE UNDER THE ORDINANCE OFFERED BY PLAINTIFF

| Date of Arrest | Defendant | Alleged Offense | Disposition |
|---|---|---|---|
| Nov. 10, 1981 | Huatko | Refusal to get off roof of burning building | Dismissed |
| Nov. 15, 1981 | Paderes | Refusing to remain silent | Bond forfeit |
| Nov. 17, 1981 | Canno | Refusing to leave | Forfeit |
| Nov. 18, 1981 | Houston | Refusing to leave | Forfeit |
| Nov. 23, 1981 | Webster | Failure to remain silent and stationary | Dismissed |
| Nov. 25, 1981 | Williams | Refusing to move along | Dismissed |
| Dec. 6, 1981 | Callendar | Refusing to leave scene when told to do so | Fined $35 |
| Dec. 18, 1981 | Garza | Remaining | Forfeit |
| Dec. 18, 1981 | Derrick | Refusing to leave | Dismissed |
| Dec. 20, 1981 | Faux | Refusal to leave scene | Dismissed |
| Dec. 30, 1981 | Ferguson | Refusing to move at officer's request | $100 fine |
| Jan. 12, 1982 | Givens | Arguing and yelling | Dismissed |
| Jan. 12, 1982 | Willis | Arguing and yelling | Dismissed |

**37.** *See* 18 U.S.C. § 111.

**38.** *City of New Orleans v. Lewis,* 269 So.2d 450, 459 (Tate, J., dissenting).

**39.** *Id.* at 460.

**40.** *See Familias Unidas v. Briscoe,* 619 F.2d 391, 405–06 (5th Cir.1980); *Fernandez v. Limmer,* 663 F.2d 619, 624, 635, 636–37 (5th Cir.1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982); *Ganey v. Edwards,* 759 F.2d 337, 339–40 (4th Cir.1985); *Nanty v. Barrows Co.,* 660 F.2d 1327, 1334 n.10 (9th Cir. 1981).

**41.** 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

| Date of Arrest | Defendant | Alleged Offense | Disposition |
|---|---|---|---|
| Jan. 12, 1982 | Cameron | Arguing | Dismissed |
| Jan. 12, 1982 | Davies | Failure to leave scene of accident | Dismissed |
| Jan. 15, 1982 | Rodriguez | Refusing to leave the scene | Forfeiture |
| Jan. 17, 1982 | Bile | Refusing to leave scene | $75 fine |
| Jan. 31, 1982 | Seminyato | Refused to leave the area | Forfeit |
| Jan. 31, 1982 | Dimitrou | Refused to leave the area | Dismissed |
| Feb. 2, 1982 | Guatando | Talking | Dismissed |
| Feb. 12, 1982 | Underwood | Refusing to leave | Dismissed |
| Feb. 12, 1982 | Jakes | Interfering | $75 fine |
| Feb. 14, 1982 | Compos | Refusing to leave scene | $75 fine |
| Feb. 14, 1982 | Williams | Refusing to leave scene | Dismissed |
| Feb. 20, 1982 | Dorsey | Refusing to leave | $75 fine |
| Feb. 22, 1982 | Apodoca | Failing to leave scene | $15 |
| Feb. 29, 1982 | Graves | Refusing to leave | $80 fine |
| Mar. 4, 1982 | Ligon | Refusing to leave | $50 |
| Mar. 5, 1982 | Wright | Refusing to leave scene | $35 |
| Mar. 8, 1982 | Sanders | Failing to remain quiet | $50 fine |
| Mar. 13, 1982 | Lee | Refusing to leave and talking | $41 fine |
| Apr. 27, 1982 | Wong | Taking pictures of a crime scene from a location he was told was restricted | Not guilty |
| Dec. 19, 1982 | Harbin | Arguing | Forfeit |
| Apr. 28, 1983 | Long | Refusing to move | Dismissed |
| Nov. 17, 1981 | Richardson | Verbal abuse | Bond Forfeit |
| Jan. 9, 1982 | Hall | Shot finger at officer | Dismissed |
| Jan. 23, 1982 | Kelly | Cursing | Dismissed |
| Nov. 8, 1981 | Ogle | Verbally yelling | Fine $81 |
| Jan. 17, 1982 | Smith | Interrupting | Fine $76 |
| Jan. 30, 1982 | Joseph | Disrupting interviews with available witnesses | Dismissed |
| Feb. 13, 1982 | Canby | Talking loudly, walking through scene | $100 fine |
| Mar. 13, 1982 | Arcenaux | [nothing was filled in] | Dismissed |

---

PATRICK E. HIGGINBOTHAM, Circuit Judge, with whom CLARK, Chief Judge, GEE, GARWOOD, E. GRADY JOLLY, W. EUGENE DAVIS, and EDITH HOLLAN JONES, Circuit Judges, join, dissenting:

I

The gulf between the majority and the dissent in this case is profound. Our disagreement reflects different views of competing constitutional principles, different perceptions of the role of federal appellate courts in relation both to the federal trial courts and to the state court systems, and different interpretations of Supreme Court precedent. With respect, we reject the fundamental premises of the majority opinion, and we dissent.

This court is unanimous in rejecting plaintiff's contention that the ordinance was unconstitutionally applied in the actual case presented. But the majority proceeds to strike down the ordinance, even though it appears that no court—state or federal—has ever been asked to interpret its scope. Pointing to the doctrine of overbreadth, the majority infers that the absence of constitutional challenge, somehow, supports its suggestion that, somehow, Texas courts were not open. Nowhere, however, does the majority identify any barrier that Texas courts or Texas law has placed before any person who believes the ordinance is unconstitutional and who has standing to question it. The majority offers a confusing statement of Texas procedure and labels the appellate path of an appeal from a conviction under the ordinance a "maze."

The label adds nothing. The Texas appellate structure follows a simple scheme familiar throughout Texas and the country. It has processed innumerable appeals of all kinds. If a maze, it is a widely understood one.

The only known challenger of the constitutionality of the ordinance is Hill. Should we then, by the reasoning of the majority, infer from the absence of previous challenges in *federal* court that we too have somehow silently deflected or deterred a decision on the constitutional question? The absence of contests in state courts is no more justification for the majority's preemptive strike than the absence of contests in federal courts would be for a contrary result.

The plaintiff's preference for a federal forum over a state appeal ought not be surprising. As the willingness of federal courts to relax the rules of standing and to strike down ordinances in their entirety increases, so also does the incentive to prosecute in the federal courts. Using the absence of a contest in an open state court to justify the exercise of federal power is circular and self-fulfilling. The refusal to wait for an actual case of unconstitutional prosecution must rest on one or more of four views poured into the plastic concept of substantial overbreadth: (1) that perceived threats to first amendment values weigh more heavily than the principles of article III; (2) that state courts are not to be trusted to decide a constitutional question properly; (3) that a Texas court could not readily construe the ordinance to save its constitutionality; and (4) finally, that the district court's findings of fact may be ignored and replaced by new facts found on appeal.

## II

The majority lays great stress on its conclusion that "the ordinance is officially regarded as penalizing the mere interruption of a policeman while in the line of duty." and its repeated insinuation that the ordinance is being applied in an unconstitutional manner. This is no more than a factual conclusion drawn by this appellate court from "a list of charges *offered in evidence*" (emphasis added). What is truly astonishing about the conclusion, apart from our newly found *power* to lift pieces of evidence out of a cold trial record and make our own factual findings, is that it is contrary to an explicit finding of the district court and depends on an inference that Hill's own highly capable counsel disavowed at oral argument.

The trial judge, having before him an abstract, prepared by Hill's lawyer, of shorthand statements made by arresting officers in police reports, and having heard proof about the circumstances under which Hill and four other persons were arrested, said: "The Court finds no evidence relating to the disposition of this type of case which shows that the ordinance is used to make improper or illegal arrests." Ignoring this unchallenged factual finding, the majority opinion relies on its own extract from Hill's abstract to suggest a contrary conclusion. Despite Hill's access to relevant court records, he offered no evidence about the circumstances of the arrests he chose to list. Hill did identify four other instances of allegedly unconstitutional application and attempted to prove them at trial. The district judge rejected all four assertions of unconstitutional application, and his findings are unchallenged. The result is that no unconstitutional application of the ordinance has even been found—and the majority is forced to hint that an example *could* be found, or simply that unchallenged factual findings may be ignored because "we know better." In choosing to infer something sinister from a selective summary of police officers' shorthand statements, the majority abandons the role of an appellate court and takes on a different role for which it has neither authority nor competence.

At oral argument, Hill's counsel conceded that the record contained no proof that the ordinance had ever been applied in a manner that would violate the first amendment rights of any citizen; that he had no quarrel with Judge DeAnda's fact

findings except with regard to the judge's conclusion that Hill's language was abusive to the officer; and that no inference of unconstitutional application could be drawn from the abstract of arrest reports on which the majority now relies.

### III

Although our proposed opinion was not joined by a majority of the court, it continues to express our view of what the court should do. Its juxtaposition with the majority opinion should make our point: that despite the majority's effort to narrow the visible differences between its analysis and ours, an unrestrained quest for a desired outcome has led the majority to usurp the trial court's fact-finding role and to display an unseemly distrust of the Texas judiciary. Judicial modesty at the least requires that we keep within our role as a court of error and that we accept state courts as legitimate partners in a federal system. We would have had the court write as follows:

### A

A Houston, Texas ordinance makes it a misdemeanor to assault or interfere with a police officer in the execution of his duty. We are urged to conclude that the arrest of Raymond Hill for violating the ordinance infringed his right of free speech, or to conclude that the ordinance is in any event facially invalid because it is unconstitutionally vague or substantially overbroad. We reject all these arguments.

### B

-1-

On February 14, 1982, Raymond Hill was arrested by uniformed police officers Kelley and Holtsclaw for violating section 34–11(a) of the Code of Ordinances of the City of Houston, Texas. The ordinance provides:

> Sec. 34–11. *Assaulting or interfering with policemen.*
>
> (a) It shall be unlawful for any person to assault, strike or in any manner op-

pose, molest, abuse or interrupt any policeman in the execution of his duty, or any person summoned to aid in making an arrest.

Violation of the ordinance is a Class C misdemeanor, punishable upon conviction in the Municipal Court of the City of Houston by a fine not to exceed $200.00.

For reasons that have not been preserved in a record, a Houston municipal court acquitted Hill of the charge. Hill filed this suit, under 42 U.S.C. § 1983, claiming that his arrest was illegal and seeking money damages from the City of Houston and the arresting officers as well as injunctive and declaratory relief. He argued that he was arrested for exercising his right of free speech. He also argued that regardless of the particulars of his own arrest, enforcement of the ordinance should be enjoined or declared invalid because it is unconstitutionally vague and because its potential for applications to protected speech so preponderates over its concededly valid applications that the ordinance is unconstitutionally overbroad. Before trial and by agreement, all claims against the two officers were dismissed and the City withdrew its jury demand. After a bench trial, the district judge rejected the constitutional attacks, upheld the arrest, and entered a judgment for the City. On appeal, a divided panel of our court voted to reverse and remand. The panel majority found that Hill had standing to question the ordinance under article III of the Constitution and concluded that the ordinance was unconstitutionally overbroad and invalid in its entirety. The panel majority did not decide whether the ordinance was unconstitutionally vague or whether, as applied, it denied Hill's right of free speech. We took the case en banc and now review the judgment of the district court.

-2-

At the time of his arrest, Raymond Hill was forty-one years old, a homosexual, and a resident of Houston, Texas. After serving five years in the state penitentiary for burglary convictions, Hill returned to Houston in 1975 and helped form the Hous-

ton Gay Political Caucus. He has since been a vocal advocate of the homosexual cause, and was on the Caucus' Board of Directors at the time of trial. In addition to employment as a paralegal, he also did radio shows for a local community service broadcasting station and, accordingly, carried a press badge.

Twice before and once after his February 14, 1982 arrest, Hill was charged with violating the challenged ordinance, although he was never convicted. He was familiar with the ordinance and had once before challenged its constitutionality in federal court; that case was dismissed without decision. When arrested on February 14, 1982, Hill was as well-acquainted with the ordinance as the arresting officers, if not more so.

Nor was the confrontation with Officers Kelley and Holtsclaw mere happenstance. Hill testified that he made a practice of deliberately confronting policemen engaged in making arrests. He was disturbed by what he perceived to be police harassment of homosexuals, and he explained his response to such police conduct as follows:

> Well, I would rather that I get arrested than those whose careers can be damaged; I would rather that I get arrested than those whose families wouldn't understand; I would rather that I get arrested than those who couldn't spend a long time in jail. I am prepared to respond in any legal, nonaggressive or nonviolent way, to any illegal police activity, at any time, under any circumstances.

Thus, it was a sophisticated and confrontation-minded Hill who came to the street scene in the Montrose section of Houston on February 14, 1982.[1] Montrose is heavily populated with homosexuals and is an active "cruising" area that attracts both male and female prostitutes. Indeed, although Hill's arrest occurred shortly after midnight, the area still had heavy traffic.

Officer Kelley testified before the federal district court that the incident began when he observed a male civilian attempting to direct traffic on a busy thoroughfare in the Montrose section. Kelley ordered this individual to the sidewalk, asked for identification, and noticed that the man was making guttural sounds and twitching motions that Kelley later learned were the result of a disability. As Kelley described the man:

> He was a very strange individual. His actions were extremely erratic and strange. He was twitching all of the time.... His whole body would jerk while he was speaking and I didn't know what to make of that. I didn't know if he was about to have a seizure or if he was being insolent or what. I had no idea what to think of it.

Before Kelley could determine the cause of this behavior, the man began walking away. Kelley explained:

> So while I was speaking to him, his mind seemed to wander and he just seemed to turn and walk away. I still had his I.D. in my hand and ... he was walking away, twitching and making all kinds of strange noises from his throat.
>
> ....
>
> I told him to stop. I told him to come back and he kept walking. I walked behind him and kept telling him to stop and he kept walking, so I reached out and turned, took him by the arms and stopped him, turned him around.

To complicate matters, a crowd began forming while Kelley was trying to interrogate this unusual detainee. As he described it:

> I felt a crowd forming around me; there was numerous people walking up and down the sidewalks here and they were crossing the street and they were slowing down, but they all seemed to be

---

1. We draw out these background facts, not to suggest that Hill is entitled to any greater or lesser first amendment protection because of them, but in order to provide a more complete picture of the individual who confronted Officers Kelley and Holtsclaw. Most of these facts were brought out at trial by Hill himself, in an effort to show that he was a likely target for harassment by the local police. It is undisputed, however, that neither Kelley nor Holtsclaw knew Hill or his reputation before they arrested him.

converging and centering in an area right behind me here on the corner. It was at this point that Raymond Hill entered the picture. He was standing in front of the crowd, "in charge" of it according to Kelley, and approximately seven or eight yards away from the spot where Kelley and the civilian detainee were standing. Kelley "heard Mr. Hill holler to me to leave him alone, he hadn't done anything wrong," but Kelley ignored the challenge and turned back to his investigation. Hill immediately yelled again, as Kelley described it, "[this] time ... more loud, more boisterous ..., 'I said, leave him alone. Why don't you pick on somebody your own size?'" Kelley interpreted the remark as somewhat threatening because of the tone Hill used: "[It was a v]ery loud, very strong voice. A commanding voice. In other words, it wasn't—he wasn't requesting me to leave him alone; he was demanding that I leave him alone."

In Kelley's view, Hill's rapport with the crowd contributed to the threat, and tensions were escalating. Indeed, Kelley asked Hill whether he was interrupting Kelley in his official duties as a policeman. Hill's response suggested to Kelley that Hill would, if necessary, physically interrupt the investigation: "[H]e looked directly at me, he placed his hands on his hips and in a very bold manner, said, yes. Why don't you pick on somebody my size?" It

was at this point that Kelley, no longer able to ignore him, interrupted his interrogation and arrested Hill for violating the ordinance.[2]

## C

### –1–

Article III of the Constitution establishes a jurisdictional threshold to be crossed by any citizen who would challenge the constitutionality of a statute. To meet this "case or controversy" requirement, Hill must "at an irreducible minimum ... 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of [the City]' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). Under this test, Raymond Hill had sufficient article III standing to question the constitutionality of the ordinance. The trial of Hill's damage claim included the issue of the ordinance's constitutionality, and Hill's adopted role as citizen-provocateur made his article III standing to seek injunctive and declaratory relief the more certain.[3] *See Ellis v. Dyson*, 421 U.S. 426, 434–35, 95 S.Ct. 1691, 1696, 44 L.Ed.2d 274 (1975).

---

**2.** Hill's version of the incident is somewhat different, but the court below found Kelley's version more credible.

**3.** As pointed out in the panel opinion:

This was not the first time Raymond Hill had been charged with violating the ordinance. In 1975, Hill approached Officers Stoffel and Strodman while they were making a traffic arrest. Hill first wrote down the identification numbers on the officers' vehicle, and then walked to within arm's length of one of the officers on the side nearest the officer's revolver. Officer Stoffel asked Hill to move along. Instead of complying, Hill moved closer to the officers, and was then arrested. He was later tried and found not guilty.

In 1977, Hill was standing near the Asylum Bookstore, an adult arcade in which the police suspected illegal activities were in

progress. When Hill observed vice squad cars parked nearby, he entered the bookstore and announced over the public address system that police officers were present and that the patrons should be prepared to produce identification. The patrons fled upon hearing the announcement, and Hill was arrested for interfering with the investigation. The case was subsequently dismissed.

Finally, in October, 1982, eight months after he was arrested for the incident [now at issue], Raymond Hill was arrested for violating the ordinance when he refused to leave the immediate area where two police officers were investigating a car parked with an unknown, unconscious person inside. The charges were later dismissed when the arresting officers failed to appear in Municipal Court.

764 F.2d at 1159.

Meeting the article III jurisdictional requirement for the assertion of his own claim, however, gives Hill no license to represent others who are not before the court. The Supreme Court has elaborated a prudential doctrine of standing under which "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Hill's contention that the ordinance is facially unconstitutional is an attempt to fit within a narrow exception to this principle, and we will return to questions of standing when we consider his overbreadth and vagueness arguments.

–2–

The first amendment, which the Supreme Court has applied to the states through the fourteenth amendment, *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 629, 69 L.Ed. 1138 (1925), undoubtedly protects Hill's rights to express publicly his opposition to such police actions as Officer Kelley's· interrogation of the man who was trying to direct traffic in Montrose. That right is not limited to speech aimed at passers-by, but includes objections directed to the police themselves, who undeniably function as representatives of government. But a "right" cannot be defined without reference to responsibility, which is its conceptual twin: Hill's right to speak out must be viewed in conjunction with his duty not to obstruct enforcement of the law. Expressed in the more familiar legal abstraction, the first amendment rights to speak and to petition are not absolute and may constitutionally be limited by content-neutral regulations that serve an important government interest by restricting the time, place, and manner in which those rights are exercised. *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647–48, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981).

We test the application of a restriction by examining the relationship between the prohibited words or conduct and the evil that government may legitimately seek to prevent. *See, e.g., Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed. 2d 430 (1969); *see also Konigsberg v. State Bar of California,* 366 U.S. 36, 49–56, 81 S.Ct. 997, 1005–10, 6 L.Ed.2d 105 (1961). We weigh the government interests furthered by the suppression of speech against the importance of the speech affected, considering both the significance of the governmental objective and the availability of alternative forums for disseminating the views whose expression is restricted. *See, e.g., Heffron,* 452 U.S. at 649–55, 101 S.Ct. at 2564–68.

As we read Houston's prohibition of interference with police officers, it is a valid time, place, and manner regulation. In Section C.3, *infra,* we explain in more detail why the ordinance may be read so as to keep it within the bounds imposed by the Constitution. For now it is necessary to point out only that the ordinance, to the extent that the City applies it at all to verbal conduct, is not a restriction on any particular message, whether addressed to the public or to police authorities. Rather, the ordinance forbids interference with police officers in the execution of their duties, and it limits the right to speak only to the extent that speech is used to create such interference. The restriction is content-neutral, and it undoubtedly serves the important state interest in law enforcement. *See Heffron,* 452 U.S. at 649–50, 101 S.Ct. at 2564–65; *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

Law enforcement is quintessentially a governmental function, and the police must often carry out that function in environments fairly teeming with obstacles, distractions, and resistance. Accordingly, the City of Houston has a powerful and legitimate interest in prohibiting interference with its officers while they are pursuing lawful investigations or executing lawful arrests. The City's interests extend to promoting the safety of its officers and of persons lawfully detained or arrested.

This is not to say that citizens must submit to public authorities like docile lambs or fawning puppy dogs, and it is not to deny that "at the constitutional level speech need not be a sedative; it can be disruptive." *Colten v. Kentucky,* 407 U.S. 104, 122, 92 S.Ct. 1953, 1963, 32 L.Ed.2d 584 (1972) (Douglas, J., dissenting). But we must acknowledge that arrests and investigations are serious matters that often occur in delicate or dangerous situations: in such settings, challenges or annoyances that might otherwise be an appropriate means of voicing opposition to the authorities may well present risks that are unacceptable when the constitutional balance is struck. The City has a strong interest in ensuring that its police officers can pursue their work without interference, whether caused by physical force or by "speech."

The Supreme Court addressed a similar situation in *Colten v. Kentucky,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). Colten was convicted under a disorderly conduct statute after he insisted on remaining at the scene of a traffic citation, despite police requests that he move on. Although Colten claimed that the first amendment protected both his right to advise the man who was getting the citation and his efforts to help arrange transportation for the driver and his passengers, the state courts found that Colten's only purpose was to aggravate, harass, and inconvenience the police as they issued the ticket. The Supreme Court affirmed the conviction and dismissed the first amendment defense:

> [Colten] had no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation at that time. The State has a legitimate interest in enforcing its traffic laws and its officers were entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction. Here the police had cause for apprehension that a roadside strip, crowded with persons and automobiles, might expose the entourage, pass-

ing motorists, and police to the risk of accident.

407 U.S. at 109, 92 S.Ct. at 1956.

Similar or greater risks were present when Hill challenged Officer Kelley on the Montrose streetcorner. Whether or not Hill would have actually assaulted Officer Kelley had he not been arrested is unimportant—his threatening disruption was sufficient, as it was intended to be, to distract Kelley from his investigation of the disturbing and possibly ill or dangerous individual whose whole body jerked when he spoke. Hill's challenge, one that might have appeared harmless in other circumstances, seemed to Kelley quite threatening when offered in front of a converging crowd. Kelley explained that he "felt apprehensive towards the crowd because of Mr. Hill" and that he perceived the crowd as a threat to his own safety, to that of his detainee, and to that of his partner who was issuing a traffic citation nearby. It should be no surprise that Kelley was unwilling simply to turn his back on Hill and pursue his investigation.

In contrast, the impact of the ordinance on Hill's desire to exercise his right of free speech was relatively trivial. There are many other times and places at which the actions of law enforcement officials may be challenged; to restrict challenges made in the context of arrests or investigations does not significantly limit the opportunity to convey one's views on any matter of public interest. More importantly, the Constitution does not require an officer to adopt a "wait and see" attitude when threats interrupt an investigation or arrest. Furthermore, there is no reason to extend constitutional protection to speech whose only purpose is, as it was here, to distract a police officer in the performance of his duties. Hill conceded at trial that he was not trying to convey any information or opinions to the crowd, but rather was attempting to divert Kelley's attention from the detainee and if necessary to substitute himself as an arrestee. Hill supposedly feared that Officer Kelley's detainee might become the victim of police brutality.

Even if the record persuaded us that such a fear could have been based on something more than sheer speculation, which it does not, the first amendment neither authorizes nor protects from subsequent prosecution anti-government vigilante actions of this kind.

We conclude that Hill's arrest was constitutionally permissible under standard and well-settled doctrine. Because Hill's "speech" was merely a device for accomplishing an illegal act, *viz.* obstructing a lawful arrest or investigation, it was punishable for the same reason that laws against perjury, fraudulent advertising, solicitation of crime, conspiracy, and similar offenses are exposed to no constitutional objection: criminal conduct not aimed at communicating ideas or information cannot be brought under the aegis of the first amendment just because it takes a verbal form. *See e.g. Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978); *Konigsberg v. State Bar*, 366 U.S. 36, 49 n. 10, 81 S.Ct. 997, 1006 n. 10, 6 L.Ed.2d 105 (1961); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S.Ct. 684, 690, 93 L.Ed. 834 (1949); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 768–69, 86 L.Ed. 1031 (1942); *Abrams v. United States*, 250 U.S. 616, 627, 40 S.Ct. 17, 21, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *Frohwerk v. United States*, 249 U.S. 204, 206, 39 S.Ct. 249, 250, 63 L.Ed. 561 (1919); *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919).

Even if we were to characterize the conduct for which Hill was arrested as including an element of "advocacy," the arrest would still be constitutionally permissible. Where "advocacy of the use of force or of law violation ... is directed to inciting or producing imminent lawless action and is likely to incite or produce such action," the first amendment offers the speaker no protection. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (footnote omitted). The *Brandenburg* test applies when a speaker is arrested *solely* for advocating lawless conduct—the test does not create any protection for otherwise illegal conduct that is accomplished with the aid of "advocacy." Because Officer Kelley's detainee was in fact left unrestrained when the officer was forced to turn his attention to Hill and the gathering crowd, there is no need to speculate about the imminence of the proscribable interference with the police or about the possibility that Hill's speech might have sparked a riot.[4]

–3–

As we have already noted, Raymond Hill had article III jurisdictional standing to challenge his arrest and prosecution under the Houston ordinance. Our decision upholding the application of the ordinance to the facts of Hill's case would ordinarily prevent him from raising further challenges to the validity of the ordinance: "the plaintiff generally must assert his own legal rights and interests, and cannot

---

**4.** The *Brandenburg* test was recently reaffirmed in *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). The Court rejected the argument that Charles Evers, leader of a boycott of white merchants in Mississippi, could be held civilly liable to the targets of the boycott because he made speeches that were likely to incite lawless action against them. The Court emphasized that Evers' political speeches had not in fact led to violence or unlawful conduct and concluded that he could not be held liable in tort for results that had not occurred. While employing a formula according to which "appeals for unity and action in a common cause [that] do not incite lawless action ... must be regarded as protected speech," 458 U.S. at 928, 102 S.Ct. at 3434, the Court pointed out that Evers might well have been

civilly liable if his speeches *had* incited unlawful conduct, *id.* at 927–28, 102 S.Ct. at 3433–34. Thus, *Claiborne Hardware* reaffirms the principle that *"debate on public issues* should be uninhibited, robust, and wide-open," *id.* at 928, 102 S.Ct. at 3434 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)) (emphasis added), and does not create any new limits on government's power to protect itself and its citizens from proscribable conduct that occurs in the guise of speech or that takes the form of political advocacy. At any rate, Raymond Hill did disrupt Officer Kelley's investigation. As we will see, the Houston ordinance does not forbid advocacy alone or attempt to reach the proscribed evil at its incipiency.

rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The Supreme Court has stressed that this general rule against *jus tertii* litigation is founded in grave, though prudential, principles of standing that counsel against deciding abstract questions about generalized or hypothetical grievances. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982). The Court has candidly acknowledged that its cases have not defined article III standing "with complete consistency" and has accordingly emphasized that the prudential rule against *jus tertii* decisions is based on principles that bear a "close relationship to the policies reflected in the Art. III requirement of actual threatened injury amenable to judicial remedy." *Id.,* 454 U.S. at 475, 102 S.Ct. at 760.

As *Valley Forge* makes clear, the *jus tertii* rule and its closely related article III concerns are as important in first amendment cases as in any other. Nevertheless, it is also true that the Supreme Court has carved out a narrow exception to the general ban on asserting the rights of parties not before the court:

> At least when statutes regulate or proscribe speech and when "no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution," the transcendent value to all society of constitutionally protected expression is deemed to justify allowing "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a

statute drawn with the requisite narrow specificity." This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression.

*Gooding v. Wilson,* 405 U.S. 518, 520–21, 92 S.Ct. 1103, 1105–06, 31 L.Ed.2d 408 (1972) (citations omitted); *see also Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973) (overbreadth doctrine is based on "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression"), *quoted in Secretary of State of Maryland v. Joseph H. Munson Co.,* 104 S.Ct. 2839, 2847 (1984).

Because the Houston ordinance is undeniably susceptible to applications that would impermissibly regulate or proscribe protected speech,[5] the *Gooding* doctrine allows Raymond Hill to challenge the facial validity of the ordinance on grounds of overbreadth. He is allowed to do so because of the importance of maintaining a socially desirable atmosphere of freedom in which issues of public interest may be discussed and debated with only the minimum legal inhibitions required by public safety and order. Perceiving the risk that this atmosphere might be insidiously chilled if the courts were forced to await a challenge presented by an actual victim of an unconstitutional application of an overly broad statute, the Supreme Court has relaxed our usual standing requirements in order to reduce this risk.

---

5. After discussing the wide range of dictionary definitions for various words in the Houston ordinance, the panel majority observed:

> If a mother pleads with a policeman to "spare my baby" while the policeman arrests her son in front of their home, she has "opposed" the policeman in the execution of his duties. If a tourist sees two policemen on the street questioning a citizen, and stops to ask them directions to a hotel, the tourist has "interrupted" the officers in the execution of their

duties. If a person in a crowd at a political function continually begs the policeman to let him past the barricade, that person has "molested" the policeman in the execution of his duties.

764 F.2d at 1163. Although there is no reason to think that the City has ever applied the ordinance to such situations, we cannot fault the panel majority for noting that such hypothetical applications, however bizarre, are at least imaginable.

This relaxation of standing requirements has not resulted in a tidy conceptual package. Indeed, the power of the social policy protecting against "chilled speech" is illustrated by how close the overbreadth doctrine comes to transgressing article III jurisdictional limits. In the occasional *jus tertii* case outside the first amendment area, the plaintiff ordinarily represents the interests of a non-party who is an identifiable member of the dramatis personae in a script already before the court or that the court can write without any great exercise of its imagination. In overbreadth cases, by contrast, the courts have sometimes been willing to make constitutional decisions without focusing sharply on the identity of the parties whose rights are threatened. *Compare e.g., Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (unidentified class of potentially chilled speakers), *with e.g., Carey v. Population Services Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (seller of contraceptives asserting rights of potential customers); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (seller of 3.2% beer asserting the rights of potential purchasers); *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (physicians asserting rights of their patients).

Whatever untidiness the overbreadth doctrine effects in the law of standing, the Houston ordinance is overbroad. This, however, is not to say that the constitutional challenge will necessarily succeed. Sensitive to the overbreadth doctrine's anomalous departure from well-settled prudential rules of standing and mindful of the close relation between those principles and the mandatory jurisdictional policies of article III, the Supreme Court has fenced in overbreadth with significant qualifications. These qualifications are designed to prevent the federal judiciary from becoming a roving commission that invalidates the people's will, as expressed through their popularly elected representatives, on the basis of essentially academic or hypothetical constitutional problems. First, if the challenged law has been, or could be, authoritatively construed so as to remove any realistic threat of unconstitutional application, the overbreadth doctrine may not be used to declare the law unconstitutional on its face. *See, e.g., Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Second, and in close relation to this rule requiring that a challenged statute's threat to protected speech be real, a statute may in any case not be struck down on overbreadth grounds unless its potential unconstitutional applications are substantial in relation to its permissible applications. *Id.*, 413 U.S. at 615, 93 S.Ct. at 2917. We therefore must consider the facial validity of the Houston ordinance with these two crucial doctrinal limitations clearly before us.

Where the state courts have authoritatively construed a statute so as to forestall its application to speech or conduct protected by the first amendment, the overbreadth doctrine is inapplicable. *See, e.g., Gooding v. Wilson*, 405 U.S. 518, 522–23, 92 S.Ct. 1103, 1106–07, 31 L.Ed.2d 408 (1972); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 573, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942). As to the Houston ordinance, the Texas courts have not yet put a limiting construction on the challenged provision. But they have not declined to do so. Those who violate the ordinance are tried in the municipal courts for the City of Houston, which have only recently been made courts of record. There is now an appeal as of right from those courts to the county criminal court. Tex.Gov't Code Ann. § 30.269(a) (Vernon 1985).[6] If the

---

**6.** On appeals to the county criminal court, Tex. Gov't Code Ann. § 30.275(c) (Vernon 1985) provides:

In each case decided by the appellate court, the court shall deliver a written opinion or order either sustaining or overruling each assignment of error presented. The court does not need to give a reason for overruling an assignment of error, but it may cite the cases on which it relied. If an assignment of error is sustained, the court shall set forth the reasons for the decision. The appellate court clerk shall mail copies of the decision to the

fine exceeds $100, a further appeal may be taken to the state courts of appeal. Tex. Gov't Code Ann. § 30.278 (Vernon 1985). The notion that we are bound by authoritative state court constructions of a statute, *see, e.g., New York v. Ferber,* 458 U.S. 747, 769 n. 24, 102 S.Ct. 3348, 3361 n. 24, 73 L.Ed.2d 1113 (1982), logically has no application until the state courts actually *do* give it some construction. It is for that reason that the Supreme Court has repeatedly recognized that a federal court faced with an overbreadth challenge may consider hypothesized limiting constructions as well as hypothesized unconstitutional applications. *See, e.g., Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 60, 96 S.Ct. 2440, 2447, 49 L.Ed.2d 310 (1976); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216 & n. 15, 95 S.Ct. 2268, 2276 & n. 15, 45 L.Ed.2d 125 (1975); *Broadrick,* 413 U.S. at 613, 93 S.Ct. at 2916; *Dombrowski v. Pfister,* 380 U.S. 479, 490, 85 S.Ct. 1116, 1122, 14 L.Ed.2d 22 (1965).

Thus, we are not averse to proffering, sua sponte, plausible limiting constructions for the ordinance. In doing so, we do not impose a construction of the ordinance upon the Texas courts. Rather, we inquire into the range of plausible constructions that those courts might adopt, and we do so in order to determine whether the ordinance is substantially overbroad on its face. Both the principle of federalism and our reluctance to decide constitutional questions when they can be avoided require us to proffer such constructions where possible and assume that the state courts will construe the ordinance consistently with the constitutional command. *See, e.g., Time, Inc. v. Hill,* 385 U.S. 374, 397, 87 S.Ct. 534, 546, 17 L.Ed.2d 456 (1967).

Although the ordinance on its face may be susceptible to troubling constructions, it need not be so construed. The state courts could, for example, easily find an intent

requirement in the ordinance; in that event, the ordinance would prohibit only conduct, verbal or non-verbal, that is intended to and actually does interfere with ongoing police activities: trivial, insignificant, or inadvertent "interruptions" of the police would not be proscribed. Similarly, the ordinance need not be construed as applicable to all police functions—indeed its last clause suggests that the ordinance might be meant to operate only in the context of arrests and detentions. It certainly could be limited to *lawful* police functions, so that public challenges to unauthorized police activities would be unaffected.[7]

Without attempting to give the regulation a definitive construction here, we think it may safely be assumed, for purposes of our inquiry into the substantiality of the ordinance's overbreadth, that it could readily be limited to intentional interferences with ongoing lawful police work, whether that interference is achieved through verbal or physical action. Government ought to be able to prohibit conduct, or even so-called "pure speech," when it interferes with the police to such an extent that they are intentionally disrupted in the execution of their duties. There is no reason to assume that the City of Houston seeks to achieve more than that through the ordinance in question. Certainly, the City sought no more when it prosecuted Raymond Hill for his behavior on February 14, 1982.

While the prosecution of such conduct or speech may in the future pose some constitutional questions—indeed, there is probably no limiting construction of the ordinance that would give assurance against every imaginable impermissible application—the obvious availability of limiting constructions is relevant to our inquiry into whether the ordinance is substantially

---

parties and to the municipal judge as soon as the decision is rendered.

**7.** Although the Constitution allows certain verbal conduct to be proscribed, the state courts might even apply the canon of *ejusdem generis*

to interpret the phrase "or in any manner oppose, molest, abuse or interrupt" as confined by the preceding clause in the ordinance to physical acts of the genre "assault or strike."

overbroad. It is to that issue that we now turn.

—4—

In *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the Court tightened the restrictions on the doctrine of overbreadth. An Oklahoma statute prohibited certain of the state's civil employees from participating in partisan political activities, and the law was challenged on first amendment grounds. The Court recognized that "some persons' arguably protected conduct [might] be caught or chilled by the statute," *id.* at 618, 93 S.Ct. at 2919, but nonetheless found the provision constitutional. Justice White explained:

> Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

*Id.* at 615, 93 S.Ct. at 2917 (citation omitted). The Court made clear in *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), that the substantiality requirement in overbreadth analysis is not limited to expressive conduct but applies as well where so-called "pure speech" is regulated. Indeed, the *Ferber* Court relied on the substantiality requirement to uphold a child pornography law.

The substantiality requirement has by no means eviscerated overbreadth analysis, and the Court has sustained a number of overbreadth challenges since *Broadrick.* *See, e.g., Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826,

63 L.Ed.2d 73 (1980); *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). But *Broadrick* has also not proven to be a sport. *See, e.g., Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 947 (1982); *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). The Court has acknowledged:

> The concept of "substantial overbreadth" is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. On the contrary, ... there must be a *realistic* danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.

*Taxpayers for Vincent,* 104 S.Ct. at 2126 (footnote and citation omitted) (emphasis added). Ironically, because there is not a more clearly stated constitutional test, it is a case-by-case inquiry that determines whether a statute will be read on a case-by-case basis. This inquiry necessarily reflects intuitive judicial valuations in a fashion that gives only limited guidance to subordinate courts. There are, however, informing principles that mitigate this difficulty.

First, the substantiality requirement embodies a reconciliation of competing constitutional values. Striking down a statute that has at its core permissible inhibitory functions simply because it might be construed to apply to conduct protected by the first amendment is in sharp tension with our constitutionally footed devotion to the decision of actual cases. The substantiality requirement does much to alleviate this tension, for it recognizes that application of the overbreadth doctrine is "manifestly strong medicine," and ensures that it will in fact be applied "sparingly" and "as a last resort." *Broadrick,* 413 U.S. at 613,

93 S.Ct. at 2916. Thus, while Hill has jurisdictional standing to launch an overbreadth challenge, every such challenge rests on hypothetical applications to hypothetical persons in hypothetical cases, and the substantiality requirement ought to be applied stringently. To dilute the substantiality requirement would betray a myopic focus on first amendment values to the exclusion of equally important principles involving federalism and article III limits on judicial power and the judicial role. Without in any way denying that overly broad statutes can have an unacceptable chilling effect on freedom of speech, we must be cautious not to engage in hyperbole and fevered speculation about imagined and unlikely threats. The chilling effect about which we are properly concerned will be signalled by objective facts such as the level of penalty, the spontaneity of the anticipated speech that is at risk of being chilled, and the opportunity to contest specific applications of the statute. When, as here, the penalty is a misdemeanor and the constitutionality of its application can be raised defensively,[8] the risk of a chilling effect is lessened.

Second, substantiality is informed by the character of the regulation. When, as here, the challenged law is inhibitory and noncensorial in its operation, we ought to be more willing to leave its hypothetical applications to other concrete cases, *see Broadrick*, 413 U.S. at 616, 93 S.Ct. at 2918, because first amendment concerns are mitigated when the regulation does not rest on unacceptable valuation of the substantive content of the regulated speech. To the extent that the Houston ordinance applies at all to verbal conduct, it could be construed to proscribe only speech that is not made with a bona fide intention to exercise a constitutional right, but solely with the intention and result of interfering with lawful police functions. As with the disorderly conduct statute at issue in *Colten v. Kentucky*, the ordinance "comes into

operation only when the individual's interest in expression, judged in the light of all relevant factors, is 'minuscule' compared to a particular public interest in preventing that expression or conduct at that time and place." *Colten*, 407 U.S. at 111, 92 S.Ct. at 1158. As with the statute in *Colten*, the potential reach of this ordinance does not seriously and manifestly threaten the constitutionally protected conduct of anyone; certainly it does not present so grave a threat that we must strike it down as *substantially* overbroad.

Finally, we note that the Supreme Court has:

repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, factual invalidation is inappropriate if the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct....'

*Parker v. Levy*, 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974) (citation omitted), *quoted in New York v. Ferber*, 458 U.S. 747, 771 n. 25, 102 S.Ct. 3348, 3362 n. 25, 73 L.Ed.2d 1113 (1982). For that reason, the Supreme Court ordinarily finds a statute void for overbreadth only when it, unlike the Houston ordinance, defines "no central core of constitutionally regulable conduct." *Ferber*, 458 U.S. at 771 n. 26, 102 S.Ct. at 3362 n. 26.

It is apparent that the Houston ordinance has three related cardinal qualities that support its validity. First, it defines a central core of indisputably regulable conduct. Second, its central focus is not on speech but on conduct—"assault, strike ... molest ... abuse." Third, the ordinance forbids constitutionally unprotected results and does not purport to reach the proscribed evil—disruption of law enforcement—at an

---

**8.** First amendment challenges to a statute, including those based on substantial overbreadth, may be raised as a defense in a criminal prosecution under Texas law. *See, e.g., Clark v. State,*

665 S.W.2d 476, 482 (Tex.Crim.App.1984); *Al-Omari v. State,* 673 S.W.2d 892, 896–98 (Tex. App.—Beaumont 1983, writ ref'd).

incipient level. With these principles in mind and judging imagined impermissible applications of the Houston ordinance "in relation to ... [its] plainly legitimate sweep," *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2918, we are not persuaded that it is substantially overbroad.

### D

Hill also asserts that the Houston ordinance is unconstitutionally vague. The due process doctrine of vagueness, however, has traditionally not allowed a plaintiff to assert the rights of third parties: "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (footnote omitted). There is seldom cause to relax the usual principles of *jus tertii* when a constitutional challenge is based on vagueness rather than overbreadth: the problem with a vague statute lies less in its chilling effect on protected speech than in its infringement on personal rights of notice and fair treatment. Accordingly, a law that satisfies the first amendment overbreadth test cannot be held void for vagueness unless it is "impermissibly vague in *all* of its applications" *id.* at 497, 102 S.Ct. at 1193 (emphasis added), so that "no standard of conduct is specified at all," *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971), as, for example, in a proscription of "all speech not protected by the Constitution."

Prior to his 1982 arrest, Hill was intimately familiar with the Houston ordinance and with how it was applied by the Houston police. Indeed, before arresting Hill, Officer Kelley specifically asked him whether he was interrupting Kelley in his official duties as a policeman. Hill knew that the conduct for which he was about to be arrested was proscribed by the ordinance and his right to due process was therefore not infringed by his arrest.

In *Kolender v. Lawson*, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), the Supreme Court identified a small class of cases in which a statute that is not necessarily vague in all its applications may nonetheless be facially invalid under the due process clause. The criminal statute at issue in *Kolender* required persons subjected to questioning under the standards of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), both to provide "credible and reliable" identification and to "account for [their] presence" to the satisfaction of the police officer making the *Terry* stop. 103 S.Ct. at 1856, 1859–60. The *Kolender* Court concluded that this statute, which provided "*no* standard for determining what a suspect has to do in order to satisfy the requirement to provide a "credible and reliable' identification," 103 S.Ct. at 1859 (emphasis added), gave such unbridled and unguided discretion to the individual policeman that it effectively delegated the legislative function to the *ad hoc* private judgment of the cop on the beat, *id.* at 1860 (citing *Smith v. Goguen*, 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974)); *see also* 103 S.Ct. at 1859 n.7. *Kolender* held that this specific statute violated the due process clause "because it *encourage[d]* arbitrary enforcement by failing to describe with *sufficient* particularity what a suspect must do in order to satisfy the statute." 103 S.Ct. at 1860 (footnote omitted)(emphasis added).

By contrast, the Houston ordinance describes the proscribed conduct with considerable particularity, as we have already explained in our discussion of substantial overbreadth. To the extent that "vagueness and overbreadth [are] logically related and similar doctrines," *Kolender*, 103 S.Ct. at 1859 n.8, the ordinance survives the *Kolender* test for the same reasons that it survives the overbreadth challenge. *See also Hoffman Estates*, 455 U.S. at 497, 102 S.Ct. at 1192 (overbreadth analysis disposes of most vagueness issues). The Houston ordinance is not on its face so lacking in objective standards that it "encourages arbitrary enforcement," *Kolender*, 103 S.Ct. at 1860, or "impermissibly delegates basic

# 1128

policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis," *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972); furthermore, the record does not indicate that the ordinance has resulted in "harsh [or] discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure," *Kolender*, 103 S.Ct. at 1860 (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972), and *Thornhill v. Alabama*, 310 U.S. 88, 97–98, 60 S.Ct. 736, 741–42, 84 L.Ed. 1093 (1940)). The ordinance is therefore not facially unconstitutional under *Kolender*.

### E

In sum, we are persuaded that the Houston ordinance was constitutionally applied to Raymond Hill for his conduct on the Montrose streetcorner. Furthermore, his challenge to the facial validity of the provision, which is based on the claim that the ordinance threatens the constitutional rights of others, cannot be sustained. An interpretation of the ordinance that would confine its application to constitutional proportions is possible, indeed likely, and we must give the courts of Texas a chance to so limit it. Constitutional problems that today are only hypothetical can and should be left for the time when they become real and concrete. We would affirm the judgment of the district court.